**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 10-4083-2-MWB |
| vs. | **MEMORANDUM OPINION AND ORDER REGARDING CRACK-TO-POWDER RATIO FOR SENTENCING** |
| BILLY WILLIAMS, SR., | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *A. Factual And Procedural Background* . . . . . . . . . . . . . . . . . . . . . 4
        *1. Recognition of the "new" ratio issue* . . . . . . . . . . . . . . . . 4
        *2. The presentencing hearing* . . . . . . . . . . . . . . . . . . . . . . 6
    *B. Framing The Issue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *1. The 100:1 ratio* . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *2. My interim position* . . . . . . . . . . . . . . . . . . . . . . . . . 9
        *3. My adoption of a 1:1 ratio* . . . . . . . . . . . . . . . . . . . . 10
        *4. The Fair Sentencing Act of 2010 and the "new" guidelines* . . 11
    *C. Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . 12
        *1. Arguments of the prosecution* . . . . . . . . . . . . . . . . . . 12
        *2. Arguments of* **amicus curiae** . . . . . . . . . . . . . . . . . . 14
        *3. Arguments of the defendant* . . . . . . . . . . . . . . . . . . . 16

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    *A. The 1986 Act: A Ratio In Search Of A Rationale* . . . . . . . . . . . . 17
        *1. Haste makes waste* . . . . . . . . . . . . . . . . . . . . . . . . 17
        *2. Resulting flaws* . . . . . . . . . . . . . . . . . . . . . . . . . . 21
            *a. Overblown fears* . . . . . . . . . . . . . . . . . . . . . . 22
            *b. Inconsistency with the goals of the 1986 Act* . . . . . . 25
            *c. Pernicious racial impact* . . . . . . . . . . . . . . . . . 27
        *3. My reasons for rejecting the 100:1 ratio* . . . . . . . . . . . . 32

**B. The 2010 Amendments: A New Ratio But No New Rationale** . . . . . . 35
    **1.**     **Compromise not substantiation** . . . . . . . . . . . . . . . . . . . 35
        **a.**     **The Department of Justice's position** . . . . . . . . . . . 36
        **b.**     **The Commission's position** . . . . . . . . . . . . . . . . . 38
        **c.**     **The congressional investigations and positions** . . . . . 42
        **d.**     **The compromise in the House and Senate** . . . . . . . . 49
        **e.**     **Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
    **2.**     **Guidelines amendments based on directives, not institutional expertise** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    **3.**     **Continuation of the old flaws** . . . . . . . . . . . . . . . . . . . . 60
        **a.**     **Overblown fears and unpersuasive rationales** . . . . . . 60
        **b.**     **Inconsistency with the goals of the 1986 Act and the 2010 FSA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        **c.**     **Continued pernicious racial impact** . . . . . . . . . . . . 62
        **d.**     **Use of the ratio as a "proxy" for perceived harms** . . . 63
    **4.**     **Additional concerns with the new sentencing scheme** . . . . . . 64
**C. Consideration Of The "New" Ratio** . . . . . . . . . . . . . . . . . . . . . . . . 69
    **1.**     **My analysis of the 18:1 ratio** . . . . . . . . . . . . . . . . . . . . . . 69
        **a.**     **Statutory minimums versus sentencing guidelines** . . . . 69
        **b.**     **Determining factors** . . . . . . . . . . . . . . . . . . . . . . . 70
        **c.**     **The "unwarranted sentencing disparities" argument** . . 72
    **2.**     **The appropriate sentencing methodology** . . . . . . . . . . . . . 79

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

This bill creates, for the very first time, a special penalty applicable to crack. Because crack is so potent, drug dealers need to carry much smaller quantities of crack than of cocaine powder. By treating 1,000 grams of freebase cocaine no more seriously than 1,000 grams of cocaine powder, which is far less powerful than freebase, current law provides a loophole that actually encourages drug dealers to sell the more deadly and addictive substance, and lets them sell thousands of doses without facing the maximum penalty possible.

—Sen. Alfonse Marcello D'Amato (R-N.Y.), 132 Cong. Rec. S8091-06, 1986 WL 776420 (daily ed. June 20, 1986)

The fact is, the chemical difference between crack and [powder] cocaine is the difference[] between water and ice. It is the same thing, and you cannot explain to a people that for doing the same thing that they should get 100-to-1 more severe treatment. It doesn't make sense.

—Rep. Keith Ellison (D-Minn.), 156 Cong. Rec. H6196-01, H6202, 2010 WL 2942883 (daily ed. July 28, 2010)

Defendant Billy Williams, Sr., came before me on March 15, 2011, for a presentencing hearing on his motion for downward variance, objections to the presentence report, and other legal issues, following his guilty plea to four crack cocaine charges. Although there were numerous other issues to be resolved in the course of Williams's sentencing, this Memorandum Opinion And Order focuses exclusively on the issue of whether I should continue to adhere to my prior determination that a 1:1 crack-to-powder ratio is appropriate to calculate the guideline sentencing range for crack cocaine

offenses,[1] or should now adopt the roughly 18:1 ratio adopted by the Sentencing Commission on November 1, 2010, pursuant to a congressional mandate[2] in the Fair Sentencing Act of 2010.[3] When I first learned that the 2010 FSA was about to be passed, I just assumed that I would change my opinion from a 1:1 ratio to the new 18:1 ratio, because I assumed that Congress would have had persuasive evidence—or at least some empirical or other evidence—before it as the basis to adopt that new ratio. I likewise assumed that the Sentencing Commission would have brought its institutional expertise and empirical evidence to bear, both in advising Congress and in adopting crack cocaine Sentencing Guidelines based on the 18:1 ratio. Failing that, I assumed that the prosecution would present at the presentencing hearing in this case some evidence supporting the 18:1 ratio. This Memorandum Opinion And Order addresses whether my modest expectations have been fulfilled and whether I should now also adopt the 18:1 ratio adopted in the amended Sentencing Guidelines.

## I. INTRODUCTION

### A. Factual And Procedural Background

#### 1. Recognition of the "new" ratio issue

On December 9, 2010, defendant Billy Williams, Sr., entered a guilty plea, without a plea agreement, to four crack cocaine offenses with which he had been charged in an

---

[1] *See United States v. Gully*, 619 F. Supp. 2d 633 (N.D. Iowa 2009).

[2] *See* U.S.S.G. App. C, Amend. 748, Reason for Amendment (SUPPLEMENT TO THE 2010 GUIDELINES MANUAL, UNITED STATES SENTENCING COMMISSION (Nov. 1, 2010), Vol. 4, 43).

[3] Pub. L. No. 111-220, 124 Stat. 2372 (Aug. 3, 2010).

Indictment handed down August 19, 2010.[4]  On February 2, 2011, recognizing that Williams's sentencing would be the first in which I would have occasion to consider whether or not to adopt the 18:1 crack-to-powder cocaine ratio adopted in the amended Sentencing Guidelines, and that the analysis of the Federal Defender on this question would be of assistance to me, I requested that the Federal Defender file a brief as *amicus curiae* addressing the crack-to-powder ratio issue.  *See* Order (docket no. 235).

The Federal Defender filed the requested Amicus Curiae Brief Of Iowa Federal Defender's Office, Addressing Whether The Court Should Employ A 1:1 Crack-To-Powder Ratio In This And Future Crack Cocaine Cases (Amicus Curiae Brief) (docket no. 262) on February 25, 2011, urging me to maintain my policy of using a 1:1 ratio.  On February 25, 2011, the prosecution also filed a Brief Addressing Whether The Court Should Vary From The Newest Crack Cocaine Guidelines Of 18:1 To A 1:1 Ratio Under 18 U.S.C. § 3553(a) (docket no. 263), urging me to impose, in the typical crack cocaine case, such as this one, a sentence within the applicable federal sentencing guideline range determined by the 18:1 ratio.  On March 8, 2011, Williams's appointed counsel filed a

---

[4]Specifically, the charges against Williams were the following:  (1) conspiring, from about January 2010, through about August 2010, to distribute 28 grams or more of crack cocaine in violation of 21 U.S.C. § 846 (**Count 1**); (2) distributing and aiding and abetting the distribution, on or about May 21 through May 24, 2010, of an unspecified quantity of crack cocaine within 1,000 feet of a public playground or school, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 851, and 860(a), and 18 U.S.C. § 2 (**Count 9**); (3) distributing and aiding and abetting the distribution, on or about June 3, 2010, of an unspecified quantity of crack cocaine within 1,000 feet of a public playground or school, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 851, and 860(a), and 18 U.S.C. § 2 (**Count 10**); and (4) distributing and aiding and abetting the distribution, on or about August 4, 2010, of an unspecified quantity of crack cocaine within 1,000 feet of a public playground or school, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 851, and 860(a), and 18 U.S.C. § 2 (**Count 11**).

Motion For Downward Variance (docket no. 274), asserting that I should vary downward and sentence Williams based on a 1:1 crack-to-powder ratio. Williams adopted the Federal Defender's arguments and offered some additional arguments in support of the 1:1 ratio primarily in response to the prosecution's brief on this issue. Although the prosecution filed a Response To Defendant's Motion For Downward Variance (docket no. 280) on March 11, 2011, the prosecution did not expressly address the crack-to-powder ratio issue in that Response.

### 2. *The presentencing hearing*

At a presentencing hearing on March 15, 2011, addressing whether or not I should adopt the new 18:1 ratio for sentencing purposes and other issues in Williams's sentencing, the prosecution was represented by Assistant United States Attorneys Shawn Wehde, the prosecutor of record, in Sioux City, Iowa, and Dan Tvedt, who authored the prosecution's brief and took the lead in arguments on the ratio issue, by telephone from Cedar Rapids, Iowa. Defendant Billy Williams, Sr., was represented by appointed counsel Jay Denne of Munger, Reinschmidt & Denne in Sioux City, Iowa. *Amicus curiae* the Federal Defender's Office was represented by Assistant Federal Defender John Messina, by telephone from Des Moines, Iowa. The oral arguments on this issue were spirited and informative.

Nevertheless, it is surprising to me that the prosecution did not present a single scintilla of medical, chemical, physiological, or other scientific or social science evidence to support its position, despite more than adequate notice that the crack-to-powder ratio issue would be my central concern and despite the Department of Justice's virtually unlimited resources for medical and scientific information. The Department of Justice also did not cite a single authoritative journal article, let alone muster the modest effort to

submit a "Brandeis Brief,"[5] in support of the 18:1 ratio. I note that the Department of Justice has made greater efforts to marshal scientific or social science evidence to overcome a single Chinese immigrant's claim for asylum based on fear of forced sterilization.[6] It is conceivable, however, that the prosecutors' somewhat lukewarm

---

[5] *See, e.g., Muller v. Oregon*, 208 U.S. 412, 419 n.1, 28 S. Ct. 324, 325 n.1, 52 L. Ed. 551 (1908) (the so-called Brandeis brief case). As the Eleventh Circuit Court of Appeals explained more than two decades ago,

> Historically, beginning with "Louis Brandeis' use of empirical evidence before the Supreme Court . . . persuasive social science evidence has been presented to the courts." Forst, Rhodes & Wellford, *Sentencing and Social Science: Research for the Formulation of Federal Guidelines*, 7 Hofstra L.Rev. 355 (1979). *See Muller v. Oregon*, 208 U.S. 412, 28 S. Ct. 324, 52 L.Ed. 551 (1908); *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954). The Brandeis brief presented social facts as corroborative in the judicial decisionmaking process. O'Brien, *Of Judicial Myths, Motivations and Justifications: A Postscript on Social Science and the Law*, 64 Judicature 285, 288 (1981). The Brandeis brief "is a well-known technique for asking the court to take judicial notice of social facts." Sperlich, [*Social Science Evidence and the Courts: Reaching Beyond the Advisory Process*,] 63 Judicature at 280, 285 n.31. "It does not solve the problem of how to bring valid scientific materials to the attention of the court. . . . Brandeis did not argue that the data were valid, only that they existed. . . . The main contribution . . . was to make extra-legal data readily available to the court." *Id.*

*McClesky v. Kemp*, 753 F.2d 877, 888 (11th Cir. 1985).

[6] *See S-Cheng v. Ashcroft*, 380 F.3d 320, 322 (8th Cir. 2004) ("To rebut Ms. Cheng's testimony [to support her claim for asylum based on fear of forced sterilization], the government presented several studies and articles on the enforcement of

(continued...)

advocacy for the 18:1 ratio in this case is because they found themselves on the horns of a dilemma, between prior statements of Attorney General Eric Holder and Assistant Attorney General Lanny A. Breuer, discussed below, advocating complete elimination of the crack/powder disparity, and some sense of obligation to defend the law and Sentencing Guidelines as ultimately enacted by Congress and the Commission, which used the 18:1 ratio. In these circumstances, perhaps strenuous advocacy for the 18:1 ratio would have been a difficult volte-face.

## B.  Framing The Issue

### 1.    The 100:1 ratio

As the Supreme Court explained in considerable detail in *Kimbrough v. United States*, 552 U.S. 85 (2007), the Anti-Drug Abuse Act of 1986 (the 1986 Act), P.L. 99-570, 100 Stat. 3207, established a "weight-driven scheme" for mandatory minimum sentences in drug cases that, in pertinent part, "adopted a '100-to-1 ratio' that treated every gram of crack cocaine as the equivalent of 100 grams of powder cocaine." 552 U.S. at 96. The Sentencing Commission then developed Sentencing Guidelines that also employed this "weight-driven scheme." *Id.* However, in doing so, "[t]he Commission did not use [its historical] empirical approach in developing the Guidelines sentences for drug-trafficking offenses," but simply followed Congress's lead. *Id.* The result was that the Sentencing Guidelines "'set sentences for the full range of possible drug quantities using the same 100-to-1 quantity ratio,'" *id.* (quoting the 1995 Report of the United States Sentencing Commission at 1), which resulted in "base offense levels ranging from 12, for

---

[6](...continued)
the population-control law in China's Fujian province.").

offenses involving less than 250 milligrams of crack (or 25 grams of powder), to 38, for offenses involving more than 1.5 kilograms of crack (or 150 kilograms of powder)." *Id.* at 97 (citing U.S.S.G. § 2D1.1(c)).

As the Supreme Court also recognized in *Kimbrough*, the Sentencing Commission "later determined that the crack/powder sentencing disparity is generally unwarranted." *Id.* at 96 (citing the 2002 Report of the United States Sentencing Commission at 91); *United States v. Spears*, 469 F.3d 1166, 1183 (8th Cir. 2006) (Bye, J., dissenting) (noting that, although the Commission was able to identify five "beliefs" as the apparent basis for the 100:1 ratio, in its 2002 Report, "[t]he Commission then systematically exposed each of these 'five important beliefs' as unsupported by its research and its study of actual federal drug sentences"), *rev'd*, 555 U.S. 261 (2009) (*per curiam*). Instead, the Commission consistently recommended lower ratios: In 1995, the Commission recommended a 1:1 ratio, but Congress rejected that recommendation; in 1997, the Commission recommended a 5:1 ratio, but Congress rejected that recommendation; in 2002, the Commission recommended lowering the ratio "at least" to 20:1, but Congress also rejected that recommendation; and in 2007, Congress accepted only a modest amendment proposed by the Commission to reduce base offense levels associated with each quantity of crack cocaine by two levels. *Kimbrough*, 552 U.S. at 99-100.

### 2.    *My interim position*

Eventually, in the post-*United States v. Booker*, 543 U.S. 220 (2005), world in which the United States Sentencing Guidelines became advisory, instead of mandatory, the Supreme Court held in *Kimbrough*, 552 U.S. at 104-05, that the Anti-Drug Abuse Act of 1986 "does not require . . . sentencing courts . . . to adhere to the 100-to-1 ratio for crack cocaine quantities other than those that trigger the statutory mandatory minimum sentences." The Supreme Court subsequently clarified in *Spears v. United States*, 555

U.S. 261, ___, 129 S. Ct. 840, 843-44 (2009) (*per curiam*), "that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines."

In *Spears*, in which I was the sentencing judge, I rejected a 100:1 ratio on categorical, policy grounds, because I found that it yielded an excessive sentence in light of the sentencing factors outlined in 18 U.S.C. § 3553(a). Consequently, I adopted a 20:1 ratio based on two other district court decisions that, in turn, reflected what those courts believed was the Sentencing Commission's expert judgment that a 20:1 ratio would be appropriate in a "mine-run" case. *See United States v. Perry,* 389 F. Supp. 2d 278, 307-308 (D.R.I. 2005) (concluding that a 20:1 ratio, as suggested by the Commission in its 2002 Report, "makes the most sense"); *United States v. Smith,* 359 F. Supp. 2d 771, 781-782 (E.D. Wis. 2005) (also using a 20:1 ratio, because the Commission's proposal for modifying mandatory minimum thresholds, translated into guidelines terms, would have resulted in a roughly 20:1 ratio); 2002 Report to Congress 106-107, App. A, 3-6. The Supreme Court affirmed my use of a 20:1 ratio. *Spears*, 555 U.S. at ___, 129 S. Ct. at 844.

### 3. *My adoption of a 1:1 ratio*

Although I adopted a 20:1 ratio in *Spears*, I soon returned to the question of the proper crack-to-powder ratio in *United States v. Gully*, 619 F. Supp. 2d 633 (N.D. Iowa 2009). I again found that it was appropriate to reject the 100:1 crack-to-powder ratio in U.S.S.G. § 2D1.1, note 10, categorically, on policy grounds, for several reasons, not least of which were the failure of the Sentencing Commission to exercise its characteristic institutional role in developing the Guidelines, the lack of support for the assumptions that apparently motivated adoption of the ratio, and the disparate impact of the ratio on black offenders. *Gully*, 619 F. Supp. 2d at 641. I also concluded that the 100:1 ratio was a

"remarkably blunt instrument" to address the perceived greater harms and dangers of crack cocaine, preferring to address those effects when they were present in a particular case. *Id.* Therefore, I developed what I believed was a reasoned alternative methodology, under which the sentencing court would calculate the guideline range under existing law (*i.e.*, using the 100:1 ratio and any appropriate guideline adjustments or departures), but then calculate an alternative guideline range using a 1:1 ratio, and ultimately use or vary from that alternative guideline range, depending upon the court's consideration of the 18 U.S.C. § 3553(a) factors, to account, for example, for the defendant's history of violence, the presence of firearms, or the defendant's recidivism. *Gully*, 619 F. Supp. 2d at 644.

### 4.     *The Fair Sentencing Act of 2010 and the "new" guidelines*

On August 3, 2010, the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (Aug. 3, 2010) (the 2010 FSA), became law. The 2010 FSA altered the quantity thresholds triggering mandatory minimum punishments for crack cocaine offenses, replacing the 5- and 50-gram thresholds with 28- and 280-gram thresholds, while leaving the triggering thresholds for powder cocaine at 500 and 5,000 grams (5 kilograms), respectively. *See* 21 U.S.C. § 841(b)(1)(A)(ii) (powder cocaine), (b)(1)(A)(iii) (crack cocaine), (b)(1)(B)(ii) (powder cocaine), (b)(1)(B)(iii) (crack cocaine) (as amended in 2010). As a result, Congress replaced the old 100:1 ratio with a new roughly 18:1 ratio (18 x 28 grams = 504 grams; 18 x 280 grams = 5,040 grams or 5.04 kilograms). At Congress's direction, the Sentencing Commission followed suit by adopting a similar disparate punishment scheme for crack and powder cocaine offenses, employing roughly the same 18:1 ratio. *See* U.S.S.G. App. C, Amend. 748, Reason for Amendment (SUPPLEMENT TO THE 2010 GUIDELINES MANUAL, UNITED STATES SENTENCING COMMISSION (2010 SUPPLEMENT) (Nov. 1, 2010), Vol. 4, 43).

With this background in mind, I turn to a summary of the arguments of the parties and *amicus curiae* concerning whether I should now adopt the "new" 18:1 crack-to-powder ratio for sentencing purposes or, instead, adhere to my prior determination, on categorical, policy grounds, that 1:1 is the proper ratio.

## C. Arguments Of The Parties

### 1. Arguments of the prosecution

In both its brief and its oral arguments on the ratio issue, the prosecution hastened to acknowledge that there is now no question that a district court has the authority to vary from the Guidelines based upon a policy disagreement. The prosecution's position, nevertheless, is that the new 18:1 ratio should not be rejected on policy grounds. The prosecution argues that the 18:1 ratio is supported by Congress's policy determination and by the Sentencing Commission's exercise of its characteristic institutional role. The prosecution also argues that my adoption of a 1:1 ratio would result in unwarranted sentencing disparities.

More specifically, the prosecution argues that, after years of debate, Congress determined that the appropriate crack-to-powder ratio is 18:1. The prosecution also argues that, on May 21, 2009, the Honorable Ricardo H. Hinojosa, Acting Chair, United States Sentencing Commission, testified before Congress that the "'Commission remains committed to its recommendation in 2002 that any statutory ratio be no more than 20-to-1,'" and that he included a statistical analysis of federal cocaine sentences as part of his testimony. Prosecution's Brief (docket no. 263) at 2 (quoting Prosecution's Exhibit 1, Statement of Ricardo H. Hinojosa, at 16 (also available at http://judiciary.house.gov/hearings/pdf/Hinojosa090521.pdf)). The prosecution then repeatedly cites the Commission's 2002 and 2007 Reports as standing for the proposition that the Commission

recommended a ratio of "at least," rather than "no more than," 20:1. Prosecution's Brief at 3. The prosecution also argues that "the new crack guidelines and new statutory weights incorporating non-identical treatment of crack and powder cocaine set forth in the 2010 FSA are based upon the Commission's empirical research and at least 15 years of public debate over the appropriate crack/powder cocaine ratio." *Id.* The prosecution contends that this is true, because the Commission has supposedly recommended a ratio of "at least" 20:1 in both its 2002 and 2007 Reports. *Id.*

Next, the prosecution argues that, "[w]hile the actions of other judges do not bind this court in determining its sentencing ratio, those decisions are informative in determining whether to use the guidelines ratio of 18:1, a 1:1 ratio, or some other ratio to avoid unwarranted sentencing disparity." *Id.* at 4. The prosecution then points out that sentencing courts have cited the crack/powder disparity as a reason for a below-guidelines sentence in only a small percentage of total crack cocaine cases in fiscal year 2009, so that "it appears that most courts give deference to the crack ratio incorporated in the guidelines." *Id.* at 4-5. The prosecution also argues that it has found only one case, *United States v. Whigham*, ___ F. Supp. 2d ___, 2010 WL 4959882 (D. Mass. 2010), applying a 1:1 ratio since passage of the 2010 FSA.[7] Thus, the prosecution opines that adopting a 1:1 ratio, instead of adhering to the 18:1 ratio passed by Congress and adopted

---

[7]The decision in *Whigham* was filed on December 3, 2010, after the November 1, 2010, "emergency" amendments to the Sentencing Guidelines and, in that decision, Judge Nancy Gertner did, indeed, adopt a 1:1 ratio in that case. *See Whigham*, ___ F. Supp. 2d at ___, 2010 WL 4959882 at *6. However, while Judge Gertner acknowledged that "[r]ecent changes in the Sentencing Guidelines have ameliorated some of these problems, particularly with respect to the crack cocaine guidelines," she also noted that "Whigham, however, was sentenced before any of the changes took effect." *Id.* at ___, 2010 WL 4959882 at *1 & n.2.

by the Sentencing Commission, may cause unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, contrary to the goals of 18 U.S.C. § 3553(a)(6).

In short, the prosecution asserts, "The Department of Justice advocates that in the typical crack cocaine case, such as this one, the court impose a sentence within the applicable federal sentencing guideline range determined by the 18:1 ratio." *Id.* at 6-7.

### 2. *Arguments of* amicus curiae

Like the prosecution, the Federal Defender, as *amicus curiae*, acknowledges that a sentencing court retains the authority to reject the new 18:1 ratio, but unlike the prosecution, the Federal Defender urges me to do just that and to continue to use the 1:1 ratio that I adopted in *Gully*. The Federal Defender argues that each of the reasons and concerns that I cited for rejecting a 100:1 ratio remains as valid today with respect to the 18:1 ratio. The Federal Defender also argues that there has been no exercise of institutional expertise in the Commission's adoption of the 18:1 ratio mandated by Congress and that Congress's mandate is based only on political compromise.

More specifically, the Federal Defender argues that the Commission's stated "Reason For Amendment" to the Sentencing Guidelines to use a new 18:1 ratio was not that the Commission had exercised its institutional role to develop guidelines based on actual sentencing practices or institutional expertise, but merely that the Commission was responding to congressional directives. The Federal Defender also argues that unsupported assumptions about the harmfulness of crack cocaine versus powder cocaine continue to infect the ratio, because Congress did not make any new findings in making its ameliorative changes in crack cocaine punishment. The Federal Defender argues that the Commission, likewise, cited no new findings that would show that the 18:1 ratio now perfectly or fairly captures the balance of harms between crack and powder cocaine.

Next, the Federal Defender points out that the new ratio continues the pernicious effects of punishing street-level crack dealers more harshly than major traffickers in powder cocaine and disproportionately impacting African-American defendants. The Federal Defender argues that the new 18:1 ratio continues to be a misguided proxy for the assumed harms of crack cocaine offenses, and is, at best, an imperfect tool for determining an appropriately individualized sentence for cocaine offenses. The Federal Defender points out that, in enacting the 2010 FSA, Congress specifically directed the Sentencing Commission to adopt enhancements for certain aggravating circumstances in drug-trafficking cases, but that, because the Guidelines still do not treat crack and powder cocaine as equivalents, these new enhancements for aggravating circumstances are piled on top of the already enhanced punishment for the assumed presence of the same aggravating circumstances in crack cases. The Federal Defender describes this effect as a "double whammy" that exacerbates the problems with the "proxy" approach.

The Federal Defender also argues that Congress's adoption of the 18:1 ratio was admittedly nothing more than a political compromise between those who favored the complete elimination of all crack/powder disparities and those who believed, for whatever reason, that crack offenses should be punished more severely than powder offenses. The Federal Defender points out that, before the 2010 FSA was passed, the Department of Justice urged that the crack/powder disparity be completely eliminated; that the House Judiciary Committee originally voted to send to the full house a version of a bill that would have enacted a 1:1 crack-to-powder ratio; and that the Senate also initially proceeded with a bill using a 1:1 ratio; but that the Senate realized it could not garner enough votes to eliminate the disparity in its entirety. The Federal Defender cites numerous statements from senators and representatives in the Congressional Record reflecting a decision to compromise to eliminate at least some of the injustices of the 100:1 ratio. Thus, the

15

Federal Defender argues that Congress's move to an 18:1 ratio as a compromise measure "should not be viewed by this court as a final, binding judgment or sentiment that all is now right and fair with crack cocaine sentencing." Amicus Curiae Brief at 17.

### 3. *Arguments of the defendant*

In addition to adopting the Federal Defender's arguments, Williams argues that the Supreme Court's March 2, 2011, decision in *Pepper v. United States*, 131 S. Ct. 1229 (2011),[8] emphatically affirms the ability of sentencing courts to reject application of the Sentencing Guidelines based on categorical, policy disagreements, and that the Court found that "'[t]his is particularly true when the Commission's views rest on wholly unconvincing rationales not reflected in the sentencing statutes Congress enacted.'" Defendant's Brief In Support Of Motion For Downward Variance (docket no. 274) at 3 (citing *Pepper*, 131 S. Ct. at 1247). Williams argues that, lacking any present rationale for the 18:1 ratio from either Congress or the Commission, the prosecutor's brief relies upon older statements by the Commission in support of a recommendation for a 20:1 ratio. However, Williams points out that I have already rejected those rationales in *Gully*.

Williams also argues that a court does not have discretion to evaluate the crack/powder ratio in light of the goals of the Sentencing Reform Act, but an obligation to do so under *Kimbrough* and *Spears*. He points out that the Supreme Court has already rejected the prosecution's "unwarranted disparity" argument by concluding that appellate review for reasonableness and on-going revision of the guidelines, not curtailing of district courts' authority to reject certain guidelines on policy grounds, is the remedy for the potential problem that differing sentences may be imposed depending on what judge is

---

[8]Not only was I the sentencing judge in *Spears*, I was also the sentencing judge in *Pepper*—perhaps coincidentally, perhaps not!

drawn for sentencing. He also argues that some good sentences and some bad sentences that might result from some judges' policy disagreements with the Guidelines is better than an uninterrupted run of bad, but consistent sentences.

## II. LEGAL ANALYSIS

I find that it is appropriate to reiterate the failings of the rationales for the 100:1 ratio in the 1986 Act, then see what, if anything, has changed in the justifications for the "new" 18:1 ratio in the 2010 FSA and the 2010 amendments to the Sentencing Guidelines.

### A. The 1986 Act: A Ratio In Search Of A Rationale

#### 1. Haste makes waste

As Judge Bye recognized in his dissent from the circuit court's majority opinion in *Spears*, the 1986 Act was rushed through Congress:

> [T]he Commission noted [in its 2002 Report] "Congress bypassed much of its usual deliberative process" when it passed the Anti-Drug Abuse Act of 1986 "[b]ecause of the heightened concern and national sense of urgency surrounding drugs generally and crack cocaine specifically[.]" 2002 Report at 5. "As a result, there were no committee hearings and no Senate or House Reports accompanying the bill that ultimately passed. . . . Thus, the legislative history for the bill that was enacted into law is limited primarily to statements made by senators and representatives during floor debates." *Id.* at 5-6.

*United States v. Spears*, 469 F.3d 1166, 1182 (8th Cir. 2006) (Bye, J., dissenting), *rev'd*, 555 U.S. 261 (2009) (*per curiam*); *United States v. Robinson*, 542 U.S. 1045, 1047 (5th Cir. 2008) (also noting the 1986 Act's "rushed" passage).

Perhaps as a consequence of Congress's rush to pass the 1986 Act, no one has found any express explanation for the 100:1 crack-to-powder ratio in its legislative history.

*See, e.g., Robinson*, 542 F.3d at 1047 ("The 1986 Act's legislative history contains 'no discussion of the 100:1 ratio.'" (quoting William Spade, Jr., *Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy*, 38 ARIZ. L. REV. 1233, 1252 (1996)); *Spears*, 469 F.3d at 1182-83 (Bye, J., dissenting) ("The Commission next examined the legislators' statements [in support of the 1986 Act] in an attempt to identify their intent in adopting the 100:1 ratio, prefaced with the comment 'there is no authoritative legislative history that explains Congress's rationale for selecting the 100-to-1 drug quantity ratio for powder cocaine and crack cocaine offenses.'" (quoting Sentencing Commission's May 2002 Report to Congress on 'Cocaine and Federal Sentencing Policy' at 7)). Indeed, the legislative history to the 1986 Act provides no single, consistent rationale for the crack/powder disparity. *Id.* (again citing Spade, *Beyond the 100:1 Ratio*, 38 ARIZ. L. REV. at 1252).

Nevertheless, federal judges, the Sentencing Commission, and other commentators have gleaned from the legislative history of the 1986 Act five "beliefs" of members of Congress that purportedly motivated enactment of the 100:1 crack-to-powder ratio. As the dissenter in *Spears* explained,

> The five beliefs were:
>
> - Crack cocaine was extremely addictive. The addictive nature of crack cocaine was stressed not only in comparison to powder cocaine, but also in absolute terms.
>
> - The correlation between crack cocaine use and distribution and the commission of other serious and violent crimes was greater than that with other drugs. Floor statements focused on psycho-pharmacologically driven, economically

compulsive, as well as systemic crime (although members did not typically use these terms).

- Physiological effects of crack cocaine were considered especially perilous, resulting in death to some users and causing devastating effects on children prenatally exposed to the drug.

- Young people were particularly prone to using and/or being involved in trafficking crack cocaine.

- Crack cocaine's purity and potency, low cost per dose, and the ease with which it was manufactured, transported, disposed of, and administered, were all leading to its widespread use.

[Sentencing Commission's May 2002 Report to Congress on 'Cocaine and Federal Sentencing Policy'] at 9-10.

*Spears*, 469 F.3d at 1182-83 (Bye, J., dissenting); *see also Robinson*, 542 U.S. at 1047 ("[V]arious members of Congress believed that 'crack is more addictive than powder cocaine'; 'that it causes crime'; 'that it has perilous physiological effects such as psychosis and death'; 'that young people are particularly prone to becoming addicted to it'; and 'that crack's low cost per dose and ease of manufacture would lead to even more widespread use of it.'" (citing Spade, *Beyond the 100:1 Ratio*, 38 ARIZ. L. REV. at 1252-55)); *United States v. Byse*, 28 F.3d 1165, 1169 (11th Cir. 1994) ("[R]eview of the legislative history of the Anti-Drug Abuse Act of 1986, in which Congress amended 21 U.S.C. § 841(b)(1) to provide enhanced penalties for offenses involving specific amounts of controlled substances, reveals that Congress imposed a harsher penalty for base cocaine than for powder cocaine because it '(1) has a more rapid onset of action, (2) is more potent, (3) is

more highly addictive, (4) is less expensive than cocaine powder, and (5) has widespread availability.'" (quoting *United States v. Thurmond*, 7 F.3d 947, 953 (10th Cir. 1993)).

Even if these five "beliefs" withstood scrutiny—which most do not, for the reasons explained below—there was nothing in the legislative history for the 1986 Act that shows any attempt to correlate the magnitude of the perceived greater harms of crack cocaine to a 100:1 crack-to-powder disparity. For example, nothing in the legislative history showed that crack is 100 times more addictive than powder; that it causes 100 times as much crime; that its physiological effects are 100 times worse; that young people are 100 times more likely to become addicted to it; or that crack is 100 times less expensive per dose or 100 times easier to manufacture than powder. Moreover, nothing in the legislative history for the 1986 Act shows that the 100:1 ratio was necessary to provide an effective deterrent for any of the supposed greater harms of crack cocaine, either as compared to powder or absolutely. Thus, I must agree with the assessment of the Fifth Circuit Court of Appeals that the 100:1 ratio in the 1986 Act "was selected . . . after Congress decided to double the 50:1 ratio found in an earlier version of the legislation to 'symbolize redoubled Congressional seriousness' on the issue." *Robinson*, 542 F.3d at 1047 (quoting *United States v. Clary*, 846 F. Supp. 768, 784 (E.D. Mo. 1994), *rev'd*, 34 F.3d 709 (8th Cir. 1994)).

The Sentencing Commission took a similar approach, establishing guidelines sentencing ranges based on a 100:1 ratio. *Kimbrough*, 552 U.S. at 96-97. Like Congress, "[a]t the time it issued this Guideline the Commission did not explain why it decided to extend the 1986 Act's 'quantity-based approach in this way.'" *United States v. Pickett*, 475 F.3d 1347, 1350 (D.C. Cir. 2007) (quoting U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing 49 (Nov. 2004) ("2004 Report")). "As a result of the Guideline, 'the sentencing guideline range (based solely on drug quantity) is three to over

six times longer for crack cocaine offenders than powder cocaine offenders with equivalent drug quantities, depending on the exact quantity of the drug involved.'" *Id.* (quoting U.S. SENTENCING COMM'N, COCAINE AND FEDERAL SENTENCING POLICY 11 (May 2002) ("2002 Report")). Like Congress, the Commission never explained what, if any, empirical evidence or social science studies supported the disparate effect of the 100:1 crack-to-powder ratio on sentences in crack and powder cases. Thus, the use of the 100:1 ratio in establishing crack/powder guidelines simply "was mandated by Congress in 21 U.S.C. § 841(b)." *United States v. Willis*, 967 F.2d 1220, 1225 (8th Cir. 1992); *accord Kimbrough*, 552 U.S. at 96.

### 2. *Resulting flaws*

As the Fifth Circuit Court of Appeals explained,

> Over the next two decades the 100:1 ratio was subjected to constant criticism, as commentators argued that the ratio was unjustified and the product of a severe overreaction, as the crack epidemic had not turned into the cataclysmic event many had feared. The Sentencing Commission itself eventually led the charge to change the ratio. Beginning in 1995, the Commission determined that the ratio was not defensible, and it proposed an amendment to the Guidelines that would implement a 1:1 ratio. Congress rejected the amendment.

*Robinson*, 542 F.3d at 1048 (footnotes omitted). Although Congress purportedly believed that "the evidence overwhelmingly demonstrates significant distinctions between crack and powder cocaine," when it rejected the Commission's call to change the 100:1 ratio in 1995, *see* H.R. Rep. No. 104-272 at 3-4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 335, 337, the supposedly "overwhelming" evidence was nothing more than anecdotal hearing testimony, on a single day, that appeared to confirm Congress's "five beliefs" about crack cocaine. *See id.* ("On June 29, 1995, the Judiciary Committee's Crime Subcommittee held

a hearing to examine the Sentencing Commission's recommended changes to the sentencing guidelines that would equalize penalties for similar quantities of crack and powder cocaine. Many of the hearing witnesses, including members of the Sentencing Commission, acknowledged important differences between crack and powder cocaine: crack is more addictive than powder cocaine; it accounts for more emergency room visits; it is most popular among juveniles; it has a greater likelihood of being associated with violence; and crack dealers have more extensive criminal records than other drug dealers and tend to use young people to distribute the drug at a greater rate.").

As the Supreme Court noted in *Kimbrough*,

> Although the Commission immediately used the 100-to-1 ratio to define base offense levels for all crack and powder offenses, it later determined that the crack/powder sentencing disparity is generally unwarranted. Based on additional research and experience with the 100-to-1 ratio, the Commission concluded that the disparity "fails to meet the sentencing objectives set forth by Congress in both the Sentencing Reform Act and the 1986 Act." 2002 Report 91.

*Kimbrough*, 552 U.S. at 97. Like the Supreme Court, I will summarize the three principal problems with the 100:1 crack-to-powder ratio identified by the Commission.

### a. Overblown fears

As the Supreme Court noted,

> First, the Commission reported, the 100-to-1 ratio rested on assumptions about "the relative harmfulness of the two drugs and the relative prevalence of certain harmful conduct associated with their use and distribution that more recent research and data no longer support." [2002 Report]; *see* United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy 8 (May 2007), available at http://www.ussc.gov/r_congress/cocaine2007.pdf (hereinafter 2007 Report) (ratio Congress embedded in the

> statute far "overstate[s]" both "the relative harmfulness" of
> crack cocaine, and the "seriousness of most crack cocaine
> offenses"). For example, the Commission found that crack is
> associated with "significantly less trafficking-related
> violence . . . than previously assumed." 2002 Report 100. It
> also observed that "the negative effects of prenatal crack
> cocaine exposure are identical to the negative effects of
> prenatal powder cocaine exposure." *Id.,* at 94. The
> Commission furthermore noted that "the epidemic of crack
> cocaine use by youth never materialized to the extent feared."
> *Id.,* at 96.

*Kimbrough*, 552 U.S. at 97. The District of Columbia Circuit Court of Appeals also relied

on the Commission for its identification of slightly different problems with relying on the

relatively greater harmfulness of crack to justify the 100:1 ratio:

> With respect to all drug trafficking offenses, the emphasis on
> drug quantity distorted the importance of that element as
> compared with other offense characteristics. 2004 Report at
> 50. With respect to cocaine, the Commission concluded that
> although powder cocaine, which is usually snorted, was less
> addictive than crack cocaine, which is smoked, *see United
> States v. Brisbane*, 367 F.3d 910, 911 (D.C. Cir. 2004), this
> difference could not account for the 100-to-1 ratio. All forms
> of cocaine are addictive. The "current penalty structure—
> which yields a five-year mandatory minimum sentence for ten
> to fifty doses of crack cocaine compared to 2,500 to 5,000
> doses of powder cocaine—greatly overstates the relative
> harmfulness of crack cocaine." 2002 Report at 93.

*Pickett*, 475 F.3d at 1350 (footnote omitted).

In his dissent from the circuit opinion in *Spears*, Judge Bye detailed why each of

the "five beliefs" of Congress upon which the 100:1 ratio was apparently based is no more

than partially true. *See Spears*, 469 F.3d at 1183-87 (Bye, J., dissenting). I find it

unnecessary to remake the wheel so ably made by Judge Bye and, instead, simply summarize his detailed and extensively-documented observations.

Citing reports of the Commission, which in turn were based on its own data and social science research, Judge Bye noted that the belief that crack is more addictive than powder is "at least partially true," but both are potentially addictive, so that "the 2002 Report establishes that the 'belief' crack cocaine is *extremely* more addictive than other drugs, including powder cocaine, is simply not well-founded." *Id.* at 1183 (emphasis in the original). Similarly, Judge Bye noted that the Commission's extensive examination of data gathered from actual crack cocaine and powder cocaine offenses in the federal system demonstrated that the "belief" that there was a correlation between crack cocaine and other serious or violent crime was not well-supported, because the correlation was not significantly greater than the correlation with powder cocaine. *Id.* at 1184. He summarized this point, as follows:

> In sum, the Commission's findings indicate there is only a marginal difference between crack cocaine and powder cocaine with respect to either's relation to other serious and violent crimes (with powder cocaine exceeding crack cocaine in some categories), and in the case of both forms of the drug the aggravating factors deemed to be the most egregious "still occurred in only a minority of the cases." [2002 Report] at 32.

*Spears*, 469 F.3d at 1185 (Bye, J., dissenting). Judge Bye also pointed out that the Commission's investigation, and the social science research it relied upon, could not confirm that crack cocaine is devastatingly more harmful to children from prenatal exposure than powder cocaine is, because the effects were, in fact, *identical*. *Id.* at 1185-86 (citing not only the Commission's 2002 Report, but copious research and studies

considered by the Commission).[9] Judge Bye also noted that, based on data assembled by the Commission itself and other social science research, the Commission's 2002 Report "also dispels the belief that young people are particularly prone to using crack and trafficking in crack." *Id.* at 1186-87. Indeed, "the evidence indicates just the opposite—when the use of crack is compared to the use of powder cocaine, the evidence suggests powder cocaine use is more prevalent among young people than crack cocaine." *Id.* at 1187. "Finally," Judge Bye observed, "the Commission's report generally indicates crack cocaine use is not nearly as widespread as the use of powder cocaine." *Id.* Judge Bye opined, and I agree, that "[i]f anything, the evidence suggests that powder cocaine should be targeted more severely than crack." *Id.*

### b.     Inconsistency with the goals of the 1986 Act

In *Kimbrough*, the Supreme Court noted that another problem with the crack/powder disparity recognized by the Commission in its Reports was that the disparity "is inconsistent with the 1986 Act's goal of punishing major drug traffickers more severely than low-level dealers." *Kimbrough*, 552 U.S. at 98. More specifically,

> Drug importers and major traffickers generally deal in powder cocaine, which is then converted into crack by street-level sellers. *See* 1995 Report 66-67. But the 100-to-1 ratio can lead to the "anomalous" result that "retail crack dealers get longer sentences than the wholesale drug distributors who supply them the powder cocaine from which their crack is produced." *Id.*, at 174.

*Kimbrough*, 552 U.S. at 98.

---

[9]Thus, the hysteria about "crack babies" at the time of the passage of the 1986 Act, with its 100:1 ratio, turned out to be baseless.

I find that this problem appears to be based, at least in part, on the assumption that crack cocaine is a different drug from powder cocaine. While it is true that the two forms of cocaine are chemically different, that fact alone misses the fact that they are also readily convertible into each other chemically and that their "convertibility" is part of the usual course of cocaine trafficking, from producers to retail purchasers. As the Eighth Circuit Court of Appeals has recognized,

> [C]ocaine occurs in nature as an alkaloid (organic base). Most cocaine imported into this country is first processed into the white, acidic powder cocaine form. Crack cocaine was developed to meet the demand for a relatively inexpensive, smokeable, highly-addictive form of cocaine. Crack is a cocaine base that is made from powder cocaine, for example, by heating powder cocaine and baking soda dissolved in water.

*United States v. Robinson*, 462 F.3d 824, 825 (8th Cir. 2006). In other words, natural cocaine base is processed into powder cocaine, for importation into the United States, then converted *back* into its base form as "crack" by cooking it with baking soda and water. *United States v. Gunter*, 462 F.3d 237, 240 n.3 (3d Cir. 2006). The Sentencing Commission likewise recognized as early as 1995 that "[d]rug importers and major traffickers generally deal in powder cocaine, which is then converted into crack by street-level sellers." *Kimbrough*, 552 U.S. at 98 (citing the 1995 Report at 66-67).

As I noted in *Gully*,

> [T]he relative ease with which powder cocaine can be converted to crack cocaine, which, among other things, allows sentences to be dramatically affected by when government officials decide to seize and arrest drug dealers, *see* UNITED STATES SENTENCING COMMISSION, SPECIAL REPORT TO CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY (April 1997) at 3-8, strongly suggests that the distinctions between the two controlled substances are artificial, at best.

*Gully*, 619 F. Supp. 2d at 641; *accord Kimbrough*, 552 U.S. at 98 (because of the convertibility of powder cocaine into crack cocaine, "the 100-to-1 ratio can lead to the 'anomalous' result that 'retail crack dealers get longer sentences than the wholesale drug distributors who supply them the powder cocaine from which their crack is produced.'" (quoting 1995 Report at 174)); *and compare* 132 Cong. Rec. S8091-06, 1986 WL 776420 (daily ed. June 20, 1986) (statement of Sen. Alfonse D'Amato) (suggesting that, by treating quantities of freebase (crack) cocaine more seriously than equal quantities of powder cocaine, the amendments in the 1986 Act would close "a loophole that actually encourages drug dealers to sell the more deadly and addictive substance, and lets them sell thousands of doses without facing the maximum penalty possible").

### c.    *Pernicious racial impact*

In *Kimbrough*, the Supreme Court pointed noted that the Commission had identified one more flaw with the 100:1 ratio:

> Finally, the Commission stated that the crack/powder sentencing differential "fosters disrespect for and lack of confidence in the criminal justice system" because of a "widely-held perception" that it "promotes unwarranted disparity based on race." 2002 Report 103. Approximately 85 percent of defendants convicted of crack offenses in federal court are black; thus the severe sentences required by the 100-to-1 ratio are imposed "primarily upon black offenders." *Ibid.*

*Kimbrough*, 552 U.S. at 98.

Although other courts have recognized this pernicious racial impact, they have held that there is no evidence of racial animus or discriminatory intent, but only evidence of an unintended result of a ratio supported by racially-neutral reasons. *See, e.g., United States v. Watts*, 553 F.3d 603, 604 (8th Cir. 2009) ("Congress clearly had rational motives for

creating the distinction between crack and powder cocaine" and "the Equal Protection Clause was not violated because there was no evidence of a racially discriminatory motive—even after noting the percentage of African Americans sentenced under the [higher crack cocaine] mandatory minimum"); *Pickett*, 475 F.3d at 1348 n.1 ("Just as Congress had race-neutral reasons for adopting the 100-to-1 ratio in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207, *see [United States v.] Johnson*, 40 F.3d [436,] 441 [(D.C. Cir. 1994)], it had race-neutral reasons for declining to adopt the 1-to-1 ratio the Sentencing Commission proposed [in 1995]."); *United States v. Thomas*, 86 F.3d 647, 655 (7th Cir. 1996) (reiterating the holding in *United States v. Baker*, 78 F.3d 1241, 1248 (7th Cir. 1996), that the disparity between crack and powder cocaine in the Sentencing Guidelines has a rational basis and does not violate the Equal Protection Clause over a defendant's challenge to the Sentencing Guidelines as racially discriminatory); *United States v. Buchanan*, 70 F.3d 818, 829 n.10 (5th Cir. 1995) (noting that court's repeated rejection of claims that the punishment disparity between crack and powder under the Sentencing Guidelines constitutes racial discrimination in violation of Fifth Amendment equal protection); *United States v. Moore*, 54 F.3d 92, 97-99 (2d Cir. 1995) (holding that Congress and the Sentencing Commission did not enact the 100:1 ratio with a racially discriminatory purpose, despite statistical evidence that the vast majority of crack cocaine offenders are black while many powder cocaine offenders are white); *United States v. Frazier*, 981 F.2d 92, 95 (3d Cir. 1992) (*per curiam*) ("We join several other courts in agreeing that there is no evidence whatsoever that suggests that the distinction drawn between cocaine base and cocaine was motivated by any racial animus or discriminatory intent on the part of either Congress or the Sentencing Commission."). Nevertheless, the 2004 Report recognized that "§ 2D1.1's use of the 100-to-1 ratio and its quantity-based approach threatens 'public confidence in the federal courts' because it has had a

disproportionate impact on African-American offenders, who in 2002 made up eighty-one percent of those sentenced for trafficking crack," *Pickett*, 475 F.3d at 1354 (quoting the 2004 Report at 131, 135), and who in fiscal year 2009, still constituted 79 percent of those convicted of crack cocaine offenses. UNITED STATES SENTENCING COMM'N, OVERVIEW OF FEDERAL CRIMINAL CASES FISCAL YEAR 2009 at 7.

Legislators, judges, prosecutors, and others also joined in the condemnation of the racial disparity resulting from federal sentencing policy, based on the 100:1 crack-to-powder ratio. Speaking against the 1995 bill that rejected the Sentencing Commission's recommendation to eliminate the crack/powder disparity entirely, Representative Scott stated,

> The reason for the Commission is to put things in perspective, Mr. Chairman. Five-year mandatory minimum for users and small-time street dealers with a couple of hundred dollars worth, 95 percent black and Hispanic. Street dealers will be replaced as soon as they get arrested. Those distributing tens of thousands of dollars of uncooked crack or pre-crack or powder can get probation, a group 75 percent white. The Commission can treat large-scale dealers of tens of thousands of dollars of uncooked crack more seriously than street dealers or simple possession without regard to political implications.
>
> This bill rejects the intelligent, nonpolitical analysis of the Commission in an unprecedented act. The bill suggests that we should go back, to send the issue back to the Sentencing Commission to study it. Yet there is no date for the end of the study. And there is nothing to study.
>
> Because they told us what they thought. They told us that there is an unjustified disparity with racial overtones. We should defeat the bill, let the nonpolitical Sentencing Commission recommendations become law. It is the fair thing to do.

141 Cong. Rec. H10255-02, H10268, 1995 WL 611041 (daily ed. Oct. 18, 1995). Speaking in support of S. 1685, a bill to reduce the sentencing disparity between powder and crack cocaine violations, at its introduction on June 25, 2007, Senator Kennedy said,

> In its 2002 report, as well as an updated report to Congress in May, the Commission has repeatedly recognized that the 100-to-1 ratio exaggerates the relative harm of crack cocaine and creates unwarranted disparities that are correlated with race and class. With a new sense of urgency, the Commission continues to call on Congress to eliminate the 100-to-1 ratio.

153 Cong. Rec. S8358-01, S8359, 2007 WL 1813954 (daily ed. June 25, 2009). Similarly, in 2007 then-Senator Joseph Biden stated, bluntly, "This 100:1 disparity is unjust, unfair, and the time has long pas[sed] for it to be undone." Steven Fanucchi, *Senate Bill Will Fix Sentencing Disparity For Crack Cocaine Possession*, The Leadership Conference Website (July 18, 2007) (quoting Sen. Biden speaking in support of the introduction of the Drug Sentencing Reform and Cocaine Kingpin Trafficking Act of 2007 (S. 1711)) (available at http://www.civilrights.org/criminal-justice/sentencing/sentencing_disparity_1. html).

On October 15, 2009, when he introduced the original bill that later became the 2010 FSA, which then would have completely eliminated the crack/powder disparity, Senator Durbin quoted Attorney General Eric Holder's testimony before the Senate Judiciary Committee as follows:

> I asked him about this issue and here is what he said.
> > When one looks at the racial implications of the crack-powder disparity, it has bred disrespect for our criminal justice system. It has made the job of those of us in law enforcement more difficult. . . . [I]t is time to do away with that disparity.

> Here on Capitol Hill, Democrats and Republicans alike have advocated fixing the disparity for years.

155 Cong. Rec. S10488-01, S10491, 2009 WL 3319524 (daily ed. Oct. 15, 2009) (statement of Sen. Durbin, quoting Attorney General Holder). In a letter favoring retroactivity of changes to the crack guidelines dated November 2, 2007, the Committee on Criminal Law of the Judicial Conference of the United States noted that the severity of then-current crack penalties, based on a 100:1 ratio, mostly impacted minorities, explaining:

> Given the possibility of real disparity in cocaine sentences and the corrosive effect of perceived disparity on public confidence in the courts, the Criminal Law Committee determined that it was appropriate to recommend that the Judicial Conference oppose the existing sentencing difference between crack and powder cocaine sentences and support the reduction of the difference. Accordingly, the Criminal Law Committee made the following recommendation:
>
> > Recommendation: That the Judicial Conference oppose the existing sentencing difference between crack and powder cocaine sentences and support the reduction of that difference.
>
> At its September 2006 meeting, the Judicial Conference endorsed that recommendation.

Available at http://www.famm.org/Repository/Files/clc_letter_re_crack_retroactivity.pdf. In testimony before the Sentencing Commission, in November 2007, Hilary Shelton, director of the NAACP's Washington Bureau, said,

> The policy of the federal government is having a devastating effect on our communities and that these laws continue to be maintained show[s], at the very least, a callous disregard for our people and our communities. It is this disregard for the fate of our people and our community that

> continues to erode our confidence in our nation's criminal
> justice system.

Quoted in Christopher Moraff, *A Crack in the System*, The American Prospect (July 9, 2007) (available at http://famm.org/PressRoom/FAMMintheNews/AmericanProspect 70907.aspx).

### 3. *My reasons for rejecting the 100:1 ratio*

As noted in the Introduction section of this ruling, in *United States v. Gully*, 619 F. Supp. 2d 633 (N.D. Iowa 2009), as I had in *Spears*, I found that it was appropriate to reject the 100:1 crack-to-powder ratio in U.S.S.G. § 2D1.1, note 10, categorically, on policy grounds, for several reasons. Those reasons were the following: The 100:1 ratio does not exemplify the Sentencing Commission's exercise of its characteristic institutional role of employing an empirical approach based on data about past sentencing practices to develop sentencing guidelines, but is the result of congressional mandates that interfere with and undermine the work of the Sentencing Commission; the assumptions about the relative harmfulness of crack cocaine and powder cocaine and the harms that come with trafficking in those controlled substances are not supported by recent research and data; the 100:1 ratio is inconsistent with the goals of the 1986 Act, because it tends to punish low-level crack traffickers more severely than major traffickers in powder cocaine; and its disproportionate impact on black offenders fosters disrespect for and lack of confidence in the criminal justice system. *Gully*, 619 F. Supp. 2d at 641.

I noted, further,

> [E]ven if crack is more addictive than powder, and even if
> crack offenses are more likely to involve weapons or bodily
> injury or to be associated with higher levels of crime, *see*
> *[Kimbrough*, 552 U.S. at ___, 128 S. Ct. at 568], the 100:1
> ratio is a remarkably blunt instrument to address those effects,
> because it simply assumes that the quantity ratio can be a

> proxy for these other harms, instead of basing the punishment on the additional criminal effects and use of weapons *when they are present in a particular case*. In addition, the relative ease with which powder cocaine can be converted to crack cocaine, which, among other things, allows sentences to be dramatically affected by when government officials decide to seize and arrest drug dealers, *see* United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy (April 1997) at 3-8, strongly suggests that the distinctions between the two controlled substances are artificial, at best.

*Gully*, 619 F. Supp. 2d at 641 (emphasis in the original).

In *Gully*, I also reconsidered my adoption of the 20:1 ratio in *Spears*. I concluded in *Gully* that even the Commission's later recommendation of a 20:1 ratio was influenced at least as much by prior congressional rejections of lower ratios and the policy considerations that Congress had mandated be part of the calculus of the appropriate ratio as it was by any empirical evidence concerning the appropriate sentences for crack offenses. *See id.* at 642 (comparing Amendments to the Sentencing Guidelines for United States Courts, 60 Fed. Reg. 25075-25077 (1995) (1:1 ratio); with United States Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy 2 (April 1997) (5:1 ratio); United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy, viii (May 2002) (recommending reducing the ratio "at least" to 20:1). I found that the reasons for my policy objections to the 100:1 ratio apply with equal force to a 20:1 ratio: Specifically, a 20:1 ratio still improperly uses the quantity ratio as a proxy for various kinds of harm and violence that may or may not come with trafficking of crack cocaine in a particular case. *Id.* Thus, I stated that I no longer considered 20:1 to be the most appropriate ratio. *Id.* Instead, I opined that "the appropriate course is to treat interchangeable forms of cocaine as equivalents, and to

enhance punishment when additional criminal effects and use of weapons, for example, are present in a particular case." *Id.* at 641.

Consequently, I sought an appropriate reasoned alternative methodology for sentencing in light of my rejection of the Sentencing Guidelines provisions for crack cases. In *Gully*, I found,

> [T]he appropriate method is to calculate the guideline range under existing law (*i.e.*, using the 100:1 ratio and any appropriate guideline adjustments or departures), but then to calculate an alternative guideline range using a 1:1 ratio, and to use or vary from that alternative guideline range depending upon the court's consideration of the 18 U.S.C. § 3553(a) factors to account, for example, for the defendant's history of violence, the presence of firearms, or the defendant's recidivism.

*Gully*, 619 F. Supp. 2d at 644. I opined that this method uses "a readily ascertainable guideline range based on a 1:1 ratio, after rejecting the 100:1 guideline ratio on policy grounds," but then permits the court to "vary based on case- or defendant-specific factors pursuant to 18 U.S.C. § 3553(a), instead of varying (probably downward) some unpredictable amount from the 100:1 ratio guideline range based, in part, on rejection of the 100:1 guideline ratio on policy grounds, with the ultimate crack-to-powder ratio obscured by consideration of other factors." *Id.* at 644-45.

In short, "[a]s a matter of both clarity, intellectual honesty, and potential consistency among defendants, it seemed to me that the appropriate course is to use consistently a 1:1 crack-to-powder ratio, then make appropriate adjustments to a defendant's sentence in light of case-specific factors pursuant to § 3553(a)." *See United States v. Golden*, 679 F. Supp. 2d 980, 987 (N.D. Iowa 2010) (reiterating and applying the methodology developed in *Gully*). Indeed, in a subsequent application of this

methodology, I have actually varied upward from the alternate guideline range determined by using a 1:1 ratio, to a sentence that exceeded a particular defendant's statutory mandatory minimum and his "standard" guideline range using a 100:1 ratio, based on case-specific factors, including a violent criminal history. *Id.*

## B. The 2010 Amendments: A New Ratio But No New Rationale

The hasty passage of the 1986 Act and the lack of any supportable rationale for the 100:1 crack-to-powder ratio in that Act or the Sentencing Guidelines promulgated pursuant to it mandate a searching inquiry to see whether there is a more supportable basis for the "new" 18:1 ratio in the 2010 FSA and the November 1, 2010, "emergency" amendments to the United States Sentencing Guidelines that followed. Thus, I turn next to an examination of the legislative history of the 2010 FSA and the rationale for the amendments to the Sentencing Guidelines in response to that Act.

### 1. Compromise not substantiation

I cannot say that, after a quarter century of experience with the 100:1 ratio, Congress has "rushed" to pass the "new" 18:1 ratio. What I can say is that the "new" 18:1 ratio, like the old 100:1 ratio, was ultimately the result of political expediency, not Congress's usual deliberative process. *Cf.* 2002 Report at 5 ("Congress bypassed much of its usual deliberative process" when it passed the Anti-Drug Abuse Act of 1986 "[b]ecause of the heightened concern and national sense of urgency surrounding drugs generally and crack cocaine specifically[.]"). While there is nothing wrong with political expediency in the legislative process or the legislative branch, it cannot be the basis for the exercise of appropriate judicial discretion in individual sentencings.

As the Federal Defender contends, before the 2010 FSA was passed, the Sentencing Commission advocated for drastic reductions in the crack-to-powder ratio; the Department

of Justice urged that the crack/powder disparity be completely eliminated; the House Judiciary Committee originally voted to send to the full House a version of the bill that would have enacted a 1:1 crack-to-powder ratio; and the Senate Judiciary Committee also initially proceeded with a bill using a 1:1 ratio; but the Senate Judicial Committee soon realized that it could not garner enough votes to eliminate the disparity in its entirety, and sent to the floor of the Senate a compromise bill with the 18:1 ratio. After the full Senate passed its version of the bill, the House also ultimately compromised by passing the Senate version. I now recount the positions of interested parties, the Department of Justice and the Sentencing Commission, at the start of the political process that ultimately led to the 2010 FSA, the legislative history of the Act, and the Commission's response.

### a.    The Department of Justice's position

As I noted in *Gully*, 619 F. Supp. 2d at 642, in a statement in a Senate hearing on proposed legislation that later became the 2010 FSA, Lanny A. Breuer, Assistant Attorney General, Criminal Division, indicated the Department of Justice's intention to "focus on formulating a new federal cocaine sentencing policy" that, *inter alia*, "completely eliminates the sentencing disparity between crack and powder cocaine but also fully accounts for violence, chronic offenders, weapon possession and other aggravating factors associated—in individual cases—with both crack and powder cocaine trafficking." Statement of Lanny A. Breuer, Assistant Attorney General, Criminal Division, United States Department of Justice, Before the United States Senate Committee on the Judiciary, Subcommittee on Crime and Drugs, Hearing Entitled "Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity," 10-11 (April 29, 2009) (April 29, 2009, Statement of AAG Breuer). As I explained in *Gully*,

> AAG Breuer also set out new directives to federal prosecutors in the field:

> Until a comprehensive solution—one that embodies new quantity thresholds and perhaps new sentencing enhancements—can be developed and enacted as legislation by Congress and as amended guidelines by the Sentencing Commission, federal prosecutors will adhere to existing law. We are gratified that the Sentencing Commission has already taken a small step to ameliorate the 100:1 ratio contained in existing statutes by amending the guidelines for crack cocaine offenses. We will continue to ask federal courts to calculate the guidelines in crack cocaine cases, as required by Supreme Court decisions. However, we recognize that federal courts have the authority to sentence outside the guidelines in crack cases or even to create their own quantity ratio. Our prosecutors will inform courts that they should act within their discretion to fashion a sentence that is consistent with the objectives of 18 U.S.C. § 3553(a) and our prosecutors will bring the relevant case-specific facts to the courts' attention.
>
> April 29, 2009, Statement of AAG Breuer at 11.

*Gully*, 619 F. Supp. 2d at 642-43.

While the prosecutors in this action purport to speak for the Department of Justice when they advocate "that in the typical crack cocaine case, such as this one, the court impose a sentence within the applicable federal sentencing guideline range determined by the 18:1 ratio," *see* Prosecution's Brief (docket no. 263), they are now taking a position that appears to be contrary to the Department directive to prosecutors described in Assistant Attorney General Breuer's Statement. I do not know, because the prosecutors have not shown me, that any different directive has come from the Department of Justice since passage of the 2010 FSA and conforming amendments to the Sentencing Guidelines made the 18:1 ratio a *fait accompli*.

### b.    *The Commission's position*

Similarly, I believe that the prosecutors in this case have either misunderstood, misstated, or misrepresented the position of the Sentencing Commission, based on the testimony of Judge Hinojosa, the Acting Chair of the Sentencing Commission, in his May 21, 2009, testimony to the House Judiciary Committee. *See* Prosecution's Exhibit 1, Statement of Ricardo H. Hinojosa (also available at http://judiciary.house.gov/hearings/ pdf/Hinojosa 090521.pdf)). First, Judge Hinojosa did not advocate or suggest that a 20:1 ratio was appropriate, based on the Commission's empirical data or other social science evidence, but that the "'Commission remains committed to its recommendation in 2002 that any statutory ratio be *no more than* 20-to-1.'" Statement of Judge Hinojosa at 16 (emphasis added). Again, this "commitment" must be understood in the context of the Commission's repeated recommendations of lower ratios, and Congress's repeated rejections of those recommendations, which I suggested in *Gully* showed that the Commission's later recommendation of a 20:1 ratio was influenced by political considerations, rather than any empirical evidence concerning the appropriate sentences for crack offenses. *See Gully*, 619 F. Supp. 2d at 642.

Second, if anything, the statistics cited by Judge Hinojosa do not support an 18:1 ratio, for the following reasons:

- Those statistics show that crack and powder cases represent nearly equal percentages of federal drug cases. *See* Statement of Judge Hinojosa at 3 ("[O]f 24,605 total drug trafficking cases in fiscal year 2008, there were 5,913 crack cocaine cases (24.0% of all drug trafficking cases) and 5,769 powder cocaine cases (23.4% of all drug trafficking cases). Of 24,748 total drug trafficking cases in fiscal year 2007, there were 5,248 crack cocaine cases (21.2% of all drug trafficking cases) and 6,172 powder cocaine cases (24.9% of all

drug trafficking cases."). Thus, sentencing in crack cases receives undue attention, as compared to powder cases, and there is no crack cocaine "epidemic."

- Those statistics show that black offenders still comprise the majority of federal crack cocaine trafficking offenders. *See id.* at 4 ("Black offenders continue to comprise the majority of federal crack cocaine trafficking offenders, but that has decreased from 91.4 percent in fiscal year 1992 to 80.6 percent in fiscal year 2008."). Thus, most of the burden of disproportionate crack sentences falls insidiously on black offenders.

- Those statistics show that crack cocaine cases involve weapons enhancements only about twice as often as powder cases, not 18 times, 20 times, or 100 times, and that the substantial majority of crack cases do not involve weapons enhancements. *See id.* at 10 ("In fiscal year 2008, 28.1 percent of crack cocaine offenders either received the guideline weapon enhancement (18.3%) or were convicted pursuant to 18 U.S.C. § 924(c) (9.8%). By comparison, 16.9 percent of powder cocaine offenders either received the guideline weapon enhancement (11.3%) or were convicted pursuant to 18 U.S.C. § 924(c) (5.6%). In fiscal year 2007, 30.5 percent of crack cocaine offenders either received the guideline weapon enhancement (19.7%) or were convicted pursuant to 18 U.S.C. § 924(c) (10.8%). By comparison, 14.6 percent of powder cocaine offenders either received the weapon enhancement (9.9%) or were convicted pursuant to 18 U.S.C. § 924(c) (4.7%).") Thus, increasing the crack-to-powder ratio based on involvement of weapons unfairly punishes the majority of crack defendants who did not engage in such conduct.

- Those statistics also show that fewer crack offenders than powder offenders receive a mitigating role adjustment, but fewer crack offenders than powder offenders receive an aggravating role adjustment. *See id.* ("In fiscal year 2008, 5.1 percent of crack cocaine offenders received a mitigating role adjustment compared to 20.0 percent of powder cocaine offenders. In fiscal year 2007, 5.7 percent of crack cocaine offenders received a mitigating role adjustment compared to 20.3 percent of powder cocaine offenders. With respect to aggravating role, in fiscal year 2008, 4.6 percent of crack cocaine offenders received an aggravating role adjustment compared to 8.1 percent of powder cocaine offenders. In fiscal year 2007, 4.6 percent of crack cocaine offenders received an aggravating role adjustment compared to 7.7 percent of powder cocaine offenders."). Thus, these statistics also do not demonstrate that crack offenders are 18 times, 20 times, or 100 times more dangerous than powder offenders.

- The cited statistics do show "that crack offenders generally have more extensive criminal history than powder cocaine offenders," and that crack offenders qualify for statutory and guideline "safety valve" provisions at relatively low rates compared to powder cocaine offenders. *See id.* at 11 ("In both fiscal years 2008 and 2007, the average criminal history category for crack cocaine offenders was Criminal History Category IV, compared to Criminal History Category II for powder cocaine offenders. . . . In fiscal year 2008, 77.8 percent of crack cocaine offenders were in a criminal history category higher than Criminal History Category I [and, thus, could not qualify for a statutory or guideline 'safety valve' provision], compared to 40.0 percent of powder cocaine offenders. In fiscal year 2007, 79.1 percent of crack cocaine

40

offenders were in a criminal history category higher than Criminal History Category I, compared to 39.2 percent of powder cocaine offenders."). Nevertheless, these statistics do not show that crack offenders are 18 times, or 20 times, or 100 times more likely to be serial offenders than powder offenders.

- The cited statistics also show that, after *Booker* and *Kimbrough*, "[c]ourts increasingly are sentencing powder cocaine offenders to sentences below the applicable sentencing guideline range *but less often than for crack cocaine offenders.*" *Id.* at 12 (emphasis added). Judge Hinojosa also acknowledged that, "[a]lthough too few cases have been sentenced post-*Spears* to draw any conclusions about the impact of that decision, the rate of non-government sponsored, below-range sentences increased to 18.4 percent [from 13.3 percent in the post-*Booker* period and 16.0 percent in the post-*Kimbrough* period], or 176 of the 959 crack cocaine cases sentenced during the post-*Spears* period (on or after January 21, 2009) that have been received, coded, and analyzed by the Commission [by May 21, 2009]." *Id.* at 14. Thus, these statistics suggest that courts find guidelines sentences to be unjust or excessive in crack cocaine cases more often than in powder cocaine cases, even if the percentages of below-range sentences are not large.

It is not surprising, then, that Judge Hinojosa made no effort, in his testimony to the House Judiciary Committee, to demonstrate that a 20:1 ratio would properly address, that is, would be properly proportional to, any of the additional risks or harms of crack cocaine trafficking that purportedly justified a ratio higher than 1:1. Indeed, in his "Recommendations," Judge Hinojosa reiterated the Commission's recommendation "that any statutory ratio be *no more than* 20-to-1." *Id.* at 16 (emphasis added). The prosecution

turns Judge Hinojosa's recommendation on its head, citing the Commission's 2002 and 2007 Reports as standing for the proposition that the Commission recommended a ratio of "at least" 20:1. Prosecution's Brief at 3. Thus, the prosecution, perhaps inadvertently, suggests that the Commission recommended that some higher ratio might also be appropriate, when Judge Hinojosa's comments clearly indicated the opposite, that a ratio lower than 20:1 would have suited the Commission.

### c. *The congressional investigations and positions*

In House Report No. 111-670(I), the House Judiciary Committee indicated that, by a vote of 16 to 9, it was reporting favorably on H.R. 3245, which would have eliminated entirely the disparity between crack and powder cocaine and the mandatory minimum sentence for simple possession of crack cocaine. H.R. Rep. No. 670(I), 111th Cong., 2nd Sess. 2010, 2010 WL 4883203. As part of its investigation, the House Judiciary Committee's Subcommittee on Crime, Terrorism, and Homeland Security held a hearing on May 21, 2009:

> Testimony was received from four Congressional Members, including Rep. Charles B. Rangel (D–NY); Rep. Sheila Jackson Lee (D–TX); Rep. Roscoe G. Bartlett (R–MD); and Rep. Maxine Waters, (D–CA).
>
> Testimony was also received from the Honorable Lanny A. Breuer, Assistant U.S. Attorney General for the Criminal Division of the Department of Justice; The Honorable Ricardo H. Hinojosa, Acting Chairman of the United States Sentencing Commission; Willie Mays Aikens, former Kansas City Royal and Federal drug offender; Marc Mauer, Executive Director of The Sentencing Project; Veronica Coleman Davis, President and CEO of the National Institute of Law and Equity (NILE); Scott Patterson, District Attorney, Easton, Maryland, on behalf of Joseph I. Cassilly, President of the National District Attorneys' Association; and Bob Bushman, Vice President, National Narcotics Officers Association. Additional materials

were submitted by Families Against Mandatory Minimums, the American Bar Association, Harvard Law Professor Charles Ogletree, and the Justice Roundtable Coalition.

2010 WL 4883203, *4.

In pertinent part, the House Report described the "Background And Need For The Legislation" as follows:

> Over the last 20 years, the assumptions about the more severe effects of crack cocaine compared to powder cocaine have been proven unfounded. In particular, the violence associated with crack, similar to violence associated with the trafficking of other drugs, has been shown to be related to the illegal drug market, rather than any physiological effects of the drug itself. The notable rise in violence in the mid-to-late 1980's, when crack cocaine began to infiltrate cities across the country, was associated with the growing drug market and the resulting territorial disputes between low-level street corner drug dealers. Moreover, recent data indicates that significantly less trafficking-related violence is associated with crack than was previously assumed. For example, in 2005: 1) 57.3% of overall crack offenses did not involve weapons with regard to any participant; 2) 67.6 % of crack offenders had no personal weapons involvement; and 3) only 2.9% of crack offenders actively used a weapon.
>
> Scientific and medical research has also found that crack and powder cocaine have essentially the same pharmacological and physiological effects on a person. In 2002, Dr. Ira J. Chasnoff, President of the Children's Research Triangle, testified before the United States Sentencing Commission that "since crack and powder cocaine are essentially the same drug, the effects on the fetal brain are the same whether the mother used crack cocaine or powder cocaine." In November 2006, Dr. Nora Volkow, Director of the National Institute on Drug Abuse of the National Institute of Health [in] testimony before the United States Sentencing Commission concluded the following:

Research consistently shows that the crucial variables at play are the immediacy, duration, and magnitude of cocaine's effects, as well as the frequency and amount of cocaine used rather than the form. In other words, the physiological and psychoactive effects of cocaine are similar regardless of whether it is in the form of cocaine hydrochloride (powder) or crack cocaine.

While many of the dangers and consequences thought to be associated with crack cocaine did not materialize, the crack cocaine law and other Federal drug laws have resulted in staggering increases in the number of Federal drug offenders in prison. For example, since 1980 offenders in Federal prisons for drug offenses has increased from 4,900 then to 99,047 in 2009. In 2009, drug offenders represent 52% of all Federal prison inmates. African Americans serve almost as much time in Federal prison for a drug offense (58.7 months) as whites do for a violent offense (61.7 months), largely due to sentencing laws such as the 100-to-1 crack-powder cocaine disparity.

Government data demonstrate that drug use rates are similar among all racial and ethnic groups. For crack cocaine, two-thirds of users in the U.S. are white or Hispanic. Furthermore, research on drug market patterns demonstrates that drug users generally purchase drugs from sellers of the same racial or ethnic background. Despite these facts, people of color are disproportionately subject to the penalties for both types of cocaine. Indeed, 81.8 percent of crack cocaine defendants in 2006 were African American.

Four reports issued by the U.S. Sentencing Commission to Congress on the Federal cocaine sentencing policy, in 1995, 1997, 2002 and 2007, have all urged Congress to change the current Federal crack cocaine law. The Commission report in 2007 reiterated its 2002 findings that the current severity of crack cocaine penalties mostly impacts minorities, overstates the harmfulness of crack cocaine in comparison with powder cocaine, and overstates the seriousness of most crack cocaine

offenses. In order to address these findings, the Commission recommended that Congress repeal the mandatory minimum penalty for simple possession of crack cocaine under 21 U.S.C. 844, reduce the 100-to-1 disparity, and increase the threshold quantities for crack cocaine offenses that result in 5- and 10-year mandatory minimum sentences in order to concentrate on more major traffickers.

2010 WL 4883203, *2-*3 (footnotes omitted). Consequently, the "Performance Goals And Objectives" of H.R. 3245 were to "eliminate[] the distinction between crack cocaine (i.e. cocaine base) and powder cocaine in Federal law, as well as the mandatory minimum Federal sentence for cocaine base." *Id.* at *5.

Nine dissenters opposed reporting H.R. 3245 to the full House, because "[t]his legislation sends the wrong message to drug dealers: that Congress does not take drug-trafficking crimes seriously." *Id.* at *9; *and compare Robinson*, 542 F.3d at 1047 (the 100:1 ratio in the 1986 Act "was selected . . . after Congress decided to double the 50:1 ratio found in an earlier version of the legislation to 'symbolize redoubled Congressional seriousness' on the issue" (quoting *Clary*, 846 F. Supp. at 784)). They took the position that tough penalties for drug trafficking had contributed to the substantial decrease in drug-related violence in the last 20 years. In their view, "[i]t would be imprudent for Congress to eliminate thresholds specific to crack cocaine from the Federal drug statutes. To do so ignores the distinction between crack and powder cocaine consumption and distribution." *Id.* at *10. The dissenters clung to the view that eliminating the crack-to-powder disparity would repeat the history of the crack epidemic of the 1980s; that crack affects its users differently than powder cocaine; and that crack offenses are more often associated with other aggravating factors, including possession of weapons, serious crimes related to its marketing and distribution, and especially violent

street crime connected with gangs, guns, serious injury, and death. *Id.* at *10-*13. They concluded,

> H.R. 3245 threatens to return America to the days when crack cocaine decimated a generation and destroyed communities. We cannot support legislation that ignores the violent and devastating crack cocaine epidemic of the past and the horrible effects of crack cocaine on our neighborhoods and communities nationwide.

2010 WL 4883203 at *13. The dissenters did not suggest any ratio other than 100:1 and did not attempt to explain how the 100:1 ratio was proportional to the supposedly different risks and harms of crack cocaine and powder cocaine.

Although there is a House Report on H.R. 3245, which would have eliminated the crack/powder disparity entirely, there is no Senate Report on S. 1789, the bill that ultimately became the 2010 FSA, with its 18:1 crack-to-powder ratio. Moreover, S. 1789 contains no provision containing "findings" upon which it is based. Thus, why and how the bill came to establish an 18:1 ratio must be gleaned, if possible, from other legislative history.

Looking back to Senator Durbin's introduction of S. 1789 on October 15, 2009, *see* 155 Cong. Rec. S10488-01, 2009 WL 3319524 (daily ed. Oct. 15, 2009), it was clear that the original intent of the bill was to eliminate entirely the crack/powder disparity:

> Right now, our cocaine laws are based on a distinction between crack and powder cocaine which cannot be justified. Our laws don't focus on the most dangerous offenders. Incarcerating for 5 to 10 years people who are possessing five sugar packets' worth of crack cocaine for the same period of time as those who are selling 500 sugar-size packets of powder cocaine is indefensible.
> The Fair Sentencing Act, which I am introducing today, would completely eliminate this crack/powder disparity. It

> establishes the same sentences for crack and powder-a 1-to-1 sentencing ratio.
>
> Those of us who supported the law establishing this disparity had good intentions. We followed the lead and advice of people in law enforcement. We wanted to address this crack epidemic that was spreading fear and ravaging communities. But we have learned a great deal in the last 20 years. We now know the assumptions that led us to create this disparity were wrong.

*Id.* at S10490; *see also id.* at S10492-S10493 (statement of Sen. Leahy) (supporting Sen. Durbin's bill and focusing on racial disparity as a reason for eliminating the 100:1 ratio); *id.* at S10493 (statement of Sen. Specter) ("I have sought recognition to urge support for the legislation introduced today by Senator Durbin to completely eliminate the unfair and unwarranted sentencing disparity between crack and powder cocaine. I am an original co-sponsor of this bill.").

Even at the introduction of S. 1789, it was clear that the proposed elimination of the crack/powder ratio would run into resistance. Senator Sessions, who would later hold out for the 18:1 compromise in the Senate Judiciary Committee, responded to Senator Durbin's comments, in part, as follows:

> I will not favor alterations that massively undercut the sentencing we have in place, but I definitely believe that the current system is not fair and that we are not able to defend the sentences that are required to be imposed under the law today.
>
> I am a strong believer in law enforcement and prosecution of those who violate our laws, particularly criminals who really do a lot of damage beyond just dealing drugs. They foster crime and form gangs. People who use cocaine tend to be violent. Even more, in some ways, people who use crack cocaine, as opposed to powder cocaine, tend to be paranoid and violent. It is not a good thing.

We don't need to give up the progress that has been
made, but at the same time we need to fix the sentencing. I
oppose anything that represents a 50, 60, 70, or 80 percent
reduction in penalties but a significant rebalancing of that
would be justified.

*Id.* at S10492 (Statement of Sen. Sessions). Senator Sessions did not explain, however,

what calculus led him to reject "a 50, 60, 70, or 80 percent reduction" in penalties as

excessive in the face of his concerns with crack-related paranoia and violence.

While it was clear that compromise on the quantity ratio would be required,

precisely how or why the Senate Judiciary Committee settled on the 18:1 ratio in the bill

that it eventually reported to the full Senate, and what medical, chemical, physiological,

or other scientific or social science evidence, if any, supported that ratio, is unclear from

the available legislative history. Perhaps the clearest hint of the basis for the 18:1 ratio

comes from a July 10, 2010, letter from members of the Senate Judiciary Committee to

"Colleagues," urging support for S. 1789. Amicus Curiae Brief (docket no. 262), Exhibit

5 (also available at http://www.famm.org/Repository/Files/FairSentencingActHouseDear

ColleagueB15D.pdf). In pertinent part, that letter states the following:

The Fair Sentencing Act would establish an 18:1 crack-
powder ratio, which reflects a bipartisan compromise that was
reached in the Senate Judiciary Committee. *This 18:1 ratio
responds to concerns raised by many in law enforcement, who
agree that the 100:1 disparity is unjustified, but argue that
crack is associated with greater levels of violence and
therefore should be subject to tougher penalties.*

*Id.* (emphasis added). Even then, however, this letter leaves to the imagination precisely

what calculus led the members of the Senate Judiciary Committee to determine that the

appropriate "compromise" ratio was 18:1.

### d. *The compromise in the House and Senate*

The House Judiciary Subcommittee and the full House Judiciary Committee reported H.R. 3245, which would have established a 1:1 ratio, to the full House on December 1, 2009. On March 15, 2010, the Senate Judiciary Committee, "without written report—reported by Patrick J. Leahy with an amendment in the nature of a substitute S.1789, the Fair Sentencing Act of 2009 by a[n] 18–0 vote, which would lower the 100 to 1 disparity between crack and powder cocaine to 18 to 1." H.R. Rep. 111-712, 124-25, 2011 WL 102773, *99. Just two days later, on March 17, 2010, the Senate passed S. 1789, with a minor amendment, by unanimous consent. On March 18, 2010, S. 1789 was referred to the House Judiciary Committee. On July 28, 2010, S. 1789 "passed the House on the suspension calendar by voice vote," after limited debate. *Id.*; 156 Cong. Rec. H6196-01, 2010 WL 2942883 (daily ed. "Proceedings and Debates," July 28, 2010). On August 3, 2010, President Barrack Obama signed S. 1789 into law (Public Law No. 111–220, 124 Stat. 2372). *Id.*

It is clear from the legislative history that proponents of S. 1789, as amended in the Senate Judiciary Committee to increase the "new" crack-to-powder ratio from 1:1 to 18:1, saw it as a political "compromise." In a statement on the floor of the Senate on March 17, 2010, after S. 1789 reached the floor, Senator Durbin sought passage of the amended bill by unanimous consent, repeatedly describing it as a "bipartisan compromise." *See* 156 Cong. Rec. S1680-02, S1680-S1681 (Statement of Sen. Durbin). He explained:

> We have talked about the need to address the crack-powder disparity for too long. Every day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust. *I wish this bill went further. My initial bill established a 1-to-1 ratio, but this is a good bipartisan compromise.* If this bill is enacted into law, it will

49

> immediately ensure that every year, thousands of people are
> treated more fairly in our criminal justice system. I hope my
> colleagues, when they hear about our efforts on this, will join
> in supporting our efforts to deal with this disparity.

*Id.* at S1681 (emphasis added). Senator Durbin also quoted Attorney General Holder as describing the compromise bill as "'mak[ing] progress toward achieving a more just sentencing policy while maintaining the necessary law enforcement tools to appropriately punish violent and dangerous drug traffickers.'" *Id.*

There being no objection, a statement of Wade Henderson, president of The Leadership Conference, in support of S. 1789, was also recorded in the record. *Id.* In pertinent part, Mr. Henderson's statement was as follows:

> For nearly two decades, The Leadership Conference has
> fought for the complete elimination of the unjustified and
> racially discriminatory disparity in sentencing between the
> crack and powder forms of cocaine. This disparity subverts
> justice, undermines confidence in our criminal justice system,
> and wreaks havoc on the African-American community. We
> strongly supported Senator Dick Durbin's bill, S. 1789, which
> would have completely eliminated the disparity.
>
> *While we are disappointed that the goal of complete*
> *elimination has not yet been accomplished and that*
> *discrimination will remain, The Leadership Conference*
> *considers the Senate Judiciary Committee's unanimous passage*
> *of the amended version of S. 1789, which reduces the disparity*
> *from a ratio of 100-to-1 to 18-to-1, to be a step forward.*
>
> This legislation represents progress but not the end of
> the fight. As Dr. King said, ["]An unjust law is a code that is
> out of harmony with the moral law.["] We are committed to
> redoubling our efforts to obtain complete elimination of this
> sentencing disparity-the only fair and just solution.

156 Cong. Rec. S1680-02, S1681 (emphasis added).

Senator Leahy echoed Senator Durbin's wish that the bill had gone further toward total elimination of the crack-to-powder disparity:

> The racial imbalance that has resulted from the cocaine sentencing disparity disparages the Constitution's promise of equal treatment for all Americans. *Although this bill is not perfect, its passage marks a significant step forward in making our drug laws fairer and more rational. Despite my belief that parity was the better policy, I have joined with Senator Durbin and support the progress represented by his compromise with Senator Sessions.* It reduces the disparities that leave some in jail for years while their more privileged counterparts go home after relatively brief sentences. Today, that compromise means we are one step closer to fixing this decades-old injustice.

*Id.* at S1683 (statement of Sen. Leahy).

The bill did pass the Senate by unanimous consent on March 17, 2010, and moved on to the House, where it displaced the House's version, H.R. 3245, which called for a 1:1 ratio. In his remarks urging passage of the comprise bill by the House, Representative Scott of Virginia, one of the House sponsors, also recognized that "S. 1789, the Fair Sentencing Act of 2010, is a bipartisan compromise that was negotiated and drafted by Democratic and Republican members of the Senate Judiciary Committee." 156 Cong. Rec. H6196-01, H6197, 2010 WL 2942883 (daily ed. "Proceedings and Debates," July 28, 2010) (statement of Rep. Scott). He also stated, "The legislation does not fully eliminate the 100-to-1 disparity in sentencing for crack and powder, but it does make good progress in addressing what is widely recognized as unfair treatment of like offenders based simply on the form of cocaine they possessed." *Id.*

This theme of "compromise," "good progress," and "a step in the right direction" was echoed in the statements of other representatives supporting passage of the bill, none

of whom described the bill as fully and fairly eliminating unwarranted disparities between crack and powder cocaine:

- In a speech to the House, Representative Henry C. "Hank" Johnson of Georgia stated, "Mr. Speaker, I rise today in support of S. 1789, the Fair Sentencing Act of 2010. For too long, crack cocaine users, predominantly minorities, have been subject to excessive penalties when compared to users of powder cocaine even though both drugs are chemically identical. *While this bill does not go far enough towards righting this injustice, it is a tremendous step in the right direction*, and I commend Senator Durbin and the rest of the Senate for passing this long overdue piece of legislation and urge my colleagues to support this bill. . . . I urge my colleagues to take an enormous step in the right direction by supporting this bill to greatly improve this outdated and discriminatory law. I urge my colleagues to support this bill." *See* 156 Cong. Rec. E1498-02, E1498-E1499, 2010 WL 2986745 (July 30, 2010) (extension of Mr. Johnson's remarks from July 28, 2010) (emphasis added).

- Similarly, Representative Clyburn of South Carolina stated, "Although I'm disappointed that this measure does not entirely eliminate the disparity, I want to commend Senators Durbin, Sessions, and Coburn for crafting a very significant compromise. The Fair Sentencing Act of 2009 will significantly reduce the disparity in sentencing for crack and powder cocaine and help to correct an enormous disparity in our criminal justice system." 156 Cong. Rec. H6196-01, H6198.

- Representative Sensenbrenner of Wisconsin stated, "This is a very fair compromise. I salute the three members of the other body who worked the

compromise out.  It is a compromise that should be endorsed by this body and sent to the President.  I urge an 'aye' vote."  *Id.*

- Representative Lee of Texas stated, "So there's more work to be done, Mr. Speaker.  But I believe this is a first step and all good-thinking Americans who understand justice will appreciate the fact that we are eliminating these disparities."  *Id.* at H6198-H6199.

- Representative Paul of Texas stated, "Mr. Speaker, I rise in support of this legislation.  It's called the Fair Sentencing Act.  I'd like to rename it, though.  I'd like to call it the Slightly Fairer Resentencing Act, because it really makes an attempt to correct a very, very serious problem in equal justice in our systems, and that effort I think we should all applaud.  I would have much preferred H.R. 3245 [with a 1:1 ratio]."  *Id.* at H6203.

- In the revision and extension of his remarks on the floor, Representative Paul added the following:  "I rise in reluctant support for S. 1789. . . .  My support is reluctant because S. 1789 is an uncomfortable mix of some provisions that reduce the harms of the federal war on drugs and other provisions that increase the harms of that disastrous and unconstitutional war.  I am supporting this legislation because I am optimistic the legislation's overall effect will be positive. . . .  While imperfect, I am optimistic that the Senate bill being considered today will reduce the harms of the federal drug war.  I also hope consideration of this legislation will enliven interest in ending the federal war on drugs."  Representative Paul stated that he would have preferred Representative Scott's bill, H.R. 3245, which would have eliminated the disparity entirely, to the "compromise" bill, because the "compromise" bill

reduces the disparity to "only 18 to one." However, he concluded, "The Senate bill does make a step in the right direction" *Id.* at H6203-H6204.

- Representative Hoyer of Maryland stated, "This bill has overwhelming bipartisan support. Whatever their opinions on drug policies, members of law enforcement, community advocates, and Members of Congress overwhelmingly support this bill." *Id.* at H6203.

- Representative Daniel E. Lungren of California, who was one of the original sponsors of the 1986 Act, asserted that the "context" of the 1986 Act explained the passage of the 100:1 ratio. He then added, "Having said that, the [co]nclusion that there is a basis for treating crack and powder differently is in no way a justification for the 100-to-1 sentencing ratio contained in the 1986 drug bill. We initially came out of committee with a 20-to-1 ratio. By the time we finished on the floor, it was 100-to-1. *We didn't really have an evidentiary basis for it, but that's what we did, thinking we were doing the right thing at the time.* Certainly, one of the sad ironies in this entire episode is that a bill which was characterized by some as a response to the crack epidemic in African American communities has led to racial sentencing disparities which simply cannot be ignored in any reasoned discussion of this issue. When African Americans, low-level crack defendants, represent 10 times the number of low-level white crack defendants, I don't think we can simply close our eyes." *Id.* at H6202 (emphasis added). Representative Lungren stated that he "cannot, and could not, support the legislation reported out of our committee to completely eliminate any disparity in treatment of these illicit substances," and that the new 28 gram threshold "serves the interests of law enforcement in reaching

wholesale and mid-level traffickers" who "often trafficked in 1-ounce quantities," because it was "close to the 1 ounce." *Id.* He also described the reduced 18:1 ratio as "tough but fair," but not in terms of a ratio now founded on science and empirical data, but as "a good compromise." *Id.*

- Representative Ellison of Minnesota, some of whose comments appear at the beginning of this opinion, did describe the reduction of the ratio as "based on what we know about the disparity in crack cocaine sentencing now, what we've learned over the years," and thanked his colleagues on the other side of the aisle "for yielding to evidence, which I think is so important," but it is clear that he believed that the evidence supported full equivalence of crack and powder cocaine, because the difference between them "is the difference[] between water and ice." *Id.* at H6202.

Similarly, the one opponent of the bill to offer a statement, Representative Smith of Texas, who would have preferred to keep the 100:1 ratio intact, did not argue that the 100:1 ratio properly addressed the differences between crack and powder cocaine, only that the harsher ratio had helped reduce drug crimes in the United States and that lowering the ratio would "send the wrong message" and potentially bring a crime epidemic back to the country. *See, e.g., id.* at H6197-H6198 (Statement of Rep. Smith (TX)) (noting the reduction in crime rates in the last 20 years since enactment of "these tough Federal trafficking penalties" and asking, "What's wrong with that? Why do we want to risk another surge of addiction and violence by reducing penalties?" and "Why enact legislation that could endanger our children and bring violence back to our inner-city communities?" and closing, "I cannot support legislation that might enable the violent and devastating crack cocaine epidemic of the past to become a clear and present danger."); *id.* at H6203

(subsequent statement of Rep. Smith) ("This bill sends the wrong message to drug dealers and those who traffic in destroying Americans' lives. It sends the message that Congress takes drug crimes less seriously than they did. The bill before us threatens to return America to the days when crack cocaine corroded the minds and bodies of our children, decimated a generation, and destroyed communities.").

This theme of "compromise" as the motivation for the 2010 FSA continued after President Obama signed the bill in post-passage laudatory comments from sponsors of the various bills. Just days after President Obama signed the 2010 FSA, Senator Kaufman noted that "[t]his reform, which significantly narrows the sentencing disparity between crack and powder cocaine from 100:1 to 18:1, is a long overdue victory for a criminal justice system rooted in fundamental fairness." However, he also noted that then-Senator Biden had introduced a bill in 2007 that changed the debate from whether the disparity should be reduced, by "shift[ing] the burden to the naysayers to justify why 1:1 wasn't the right policy solution." He also noted that, after Senator Durbin took over sponsorship of the bill, he "worked closely with colleagues on both sides of the aisle to find a compromise that would both satisfy the needs of law enforcement and return fundamental fairness to the sentencing for these sorts of offenses." 156 Cong. Rec. S6866-02, S6867, 2010 WL 3058509 (daily ed. Aug. 5, 2010).

Similarly, Senator Durbin included the following concerning the 2010 FSA in his December 22, 2010, statement of "Senate Accomplishments":

> No. 18 is a bill I worked on, and the most unlikely political odd couple on Capitol Hill, JEFF SESSIONS. It is the Fair Sentencing Act which reduced the unfair disparity in sentencing between crack and powder cocaine. There are literally thousands of men and women serving time in prison because of this disparity in sentencing. Senator Sessions and I reached an accommodation, an agreement, a compromise on

> sentencing which brings us closer to the reality of the danger of the narcotics involved. I thank him for his bipartisan cooperation.

156 Cong. Rec. S11012-01, S11013, 2010 WL 5185246 (daily ed. Dec. 22, 2010).

Perhaps the most enthusiastic endorsement of the 18:1 ratio to be found in the legislative record is South Carolina Representative Bob Inglis's September 16, 2010, speech "Celebrating Passage Of S. 1789, Fair Sentencing Act of 2010," which included the following statement:

> A broad coalition of civil rights, criminal justice, community-based, and faith-based organizations have joined forces to rectify the disparity. With the passage of the Fair Sentencing Act of 2010 (S.1789), the sentencing disparity is corrected from the current 100 to 1 ratio to 18 to 1, while establishing stiff new penalties for serious drug offenses.

156 Cong. Rec. E1665-05, E1666. Yet, even Representative Inglis's statement is not an assertion that the 18:1 ratio *fully* corrects the crack/powder disparity.

### e. Summary

In short, whatever new information Congress had or new investigation Congress did appeared to support complete elimination of the 100:1 disparity. Only political compromise resulted in the passage of the 18:1 ratio, for which no specific justification can be found in the legislative history. *Compare Robinson*, 542 F.3d at 1047 ("The 1986 Act's legislative history contains 'no discussion of the 100:1 ratio,'" (quoting William Spade, Jr., *Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy*, 38 ARIZ. L. REV. 1233, 1252 (1996)); *Spears*, 469 F.3d at 1182-83 (Bye, J., dissenting) ("The Commission next examined the legislators' statements [in support of the 1986 Act] in an attempt to identify their intent in adopting the 100:1 ratio, prefaced with the comment 'there is no authoritative legislative history that explains Congress's rationale for selecting

the 100-to-1 drug quantity ratio for powder cocaine and crack cocaine offenses.'" (quoting Sentencing Commission's May 2002 Report to Congress on 'Cocaine and Federal Sentencing Policy' at 7)).

## 2. *Guidelines amendments based on directives, not institutional expertise*

Section 8 of the 2010 FSA provided the Sentencing Commission with emergency authority to amend the Guidelines, as follows:

> The United States Sentencing Commission shall—
> (1) promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act, in accordance with the procedure set forth in section 21(a) of the Sentencing Act of 1987 (28 U.S.C. 994 note), as though the authority under that Act had not expired; and
> (2) pursuant to the emergency authority provided under paragraph (1), *make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law.*

Pub. L. No. 111-220 § 8, 124 Stat. 2372, 2374 (emphasis added).

The Commission did, indeed, promulgate "conforming amendments" to the Sentencing Guidelines on November 1, 2010. *See* 2010 SUPPLEMENT. Amendment 748 to the Sentencing Guidelines reflected the quantity ratio adjustments in light of the 18:1 ratio in the 2010 FSA. *Id.,* Vol. 4 at 36. The "Reason for Amendment" offered by the Commission was that it "implements the emergency directive in section 8 of the Fair Sentencing Act of 2010, Pub. L. 111-220 (the "Act")." *Id.* at 42. The Commission then explained the methodology it used to establish base offense levels conforming to the new 18:1 ratio, as follows:

> To account for these statutory changes [to the quantities
> triggering mandatory minimum sentences for crack offenses in
> the 2010 FSA], the amendment conforms the guideline penalty
> structure for crack cocaine offenses to the approach followed
> for other drugs, i.e., the base offense levels for crack cocaine
> are set in the Drug Quantity Table so that the statutory
> minimum penalties correspond to levels 26 and 32. See
> generally § 2D1.1, comment. (backg'd). Accordingly, using
> the new drug quantities established by the Act, offenses
> involving 28 grams or more of crack cocaine are assigned a
> base offense level of 26, offenses involving 280 grams or more
> of crack cocaine are assigned a base offense level of 32, and
> other offense levels are established by extrapolating upward
> and downward. Conforming to this approach ensures that the
> relationship between the statutory penalties for crack cocaine
> offenses and the statutory penalties for offenses involving other
> drugs is consistently and proportionally reflected throughout
> the Drug Quantity Table.

See 2010 SUPPLEMENT, Vol. 4 at 43.

The "Reason for Amendment" does not indicate any independent findings by the

Commission or any independent analysis of medical, chemical, physiological, or other

scientific or social science evidence explaining why the 18:1 ratio is appropriate.

Nevertheless, the prosecution argues that "the new crack guidelines and new statutory

weights incorporating non-identical treatment of crack and powder cocaine set forth in the

2010 FSA are based upon the Commission's empirical research and at least 15 years of

public debate over the appropriate crack/powder cocaine ratio," citing the Commission's

recommendations of a ratio of 20:1 in both its 2002 and 2007 Reports. Prosecution's Brief

(docket no. 263) at 3. In my view, the best that can be said for the 18:1 ratio is that it is

below the "ceiling" of 20:1 that the Commission has grudgingly endorsed since 2002, and

that grudging endorsement, I have suggested—and nothing has persuaded me

differently—is influenced by political considerations, not medical, chemical, physiological, or other scientific or social science evidence. *See Gully*, 619 F. Supp. 2d at 642.

### 3. Continuation of the old flaws

Not only was the 18:1 ratio in the 2010 FSA and the November 1, 2010, amendments to the Sentencing Guidelines the product of political compromise, not an authoritative rationale, it continued the same flaws that were present in the 100:1 ratio in the 1986 Act. As was the case with the 1986 Act, these continuing problems arise in substantial part from the lack of any correlation between the magnitude of the real or perceived harms of crack cocaine to an 18:1 crack-to-powder disparity. I will now survey these continuing problems.

### a. Overblown fears and unpersuasive rationales

First, there is still no persuasive rationale for maintaining the crack/powder disparity at all, let alone maintaining it at 18:1. To the extent that the rationale for maintaining some disparity is that eliminating the disparity, and thereby reducing punishments for crack offenses, sends the "wrong message" that Congress is not "serious" about drug offenses, *see, e.g.,* 156 Cong. Rec. H6196-01, H6203 (statement of Rep. Smith) ("This bill sends the wrong message to drug dealers and those who traffic in destroying Americans' lives. It sends the message that Congress takes drug crimes less seriously than they did."), the same "seriousness" rationale for the 1986 Act, *see Robinson*, 542 F.3d at 1047 (the 100:1 ratio in the 1986 Act "was selected . . . after Congress decided to double the 50:1 ratio found in an earlier version of the legislation to 'symbolize redoubled Congressional seriousness' on the issue" (quoting *Clary*, 846 F. Supp. at 784)), has not silenced decades of widespread criticism that, in being "serious" about drug crimes, the 1986 Act is seriously unfair. *See generally* H.R. Rep. No. 670(I), 111th Cong., 2nd Sess. 2010, 2010 WL 4883203; *Kimbrough*, 552 U.S. at 96 (the

Sentencing Commission "later determined that the crack/powder sentencing disparity is generally unwarranted" (citing the 2002 Report of the United States Sentencing Commission at 91)). The 18:1 rationale also appears to be based on the same fears about the risks and harms of crack cocaine that motivated the larger disparity in the 1986 Act, *See generally* H.R. Rep. No. 670(I), 111th Cong., 2nd Sess. 2010, 2010 WL 4883203 (views of dissenters in the House Judiciary Committee),[10] but those fears have now been shown to be overblown. *See supra*, Section II.A.2.a., beginning on page 22. To the extent that any more specific or different rationale for the 18:1 disparity can be found in the legislative history of the 2010 FSA, that rationale appears to be that the new 28-gram threshold for a statutory mandatory minimum sentence of 5 years "serves the interests of law enforcement in reaching wholesale and mid-level traffickers" who "often trafficked in 1-ounce quantities," because it is "close to the 1 ounce." 156 Cong. Rec. H6196-01, H6202 (statement of Rep. Lundgren). Nothing in the legislative history indicates that this rationale was generally accepted by the opponents of eliminating the disparity entirely; it certainly was not embraced by the majority of those who accepted the "compromise." Thus, the 18:1 ratio continues to be a ratio in search of a persuasive rationale.

### b.     *Inconsistency with the goals of the 1986 Act and the 2010 FSA*

In *Kimbrough*, the Supreme Court noted that the Commission had recognized that the 100:1 ratio was "inconsistent with the 1986 Act's goal of punishing major drug traffickers more severely than low-level drug dealers," because importers and major dealers generally deal in powder, but street-level dealers deal in crack, leading to the "anomalous" result that retail crack dealers got longer sentences than the wholesale

---

[10] The views of the dissenters in the House Judiciary Committee are summarized, *supra*, beginning on page 45.

distributors who supplied them with the powder they used to make crack. 552 U.S. at 98. I noted, *supra*, beginning on page 26, that this problem arose, at least in part, from failure to recognize that the two forms of cocaine are readily convertible into each other and that their "convertibility" is part of the usual course of cocaine trafficking, from producers to retail purchasers. Nothing in the change to an 18:1 ratio fairly or fully addresses this "convertibility" of powder and crack cocaine or the "anomalous" effect of sentencing low-level retail crack dealers to longer sentences than their wholesale suppliers of powder. While the sentencing "anomaly" is likely to be somewhat mitigated by a less extreme ratio, it remains an "anomaly," where "the chemical difference between crack and [powder] cocaine is the difference[] between water and ice," and it is just as difficult to explain to people that, for doing the same thing, they should get 18-to-1 more severe treatment. 156 Cong. Rec. H6196-01, H6202, 2010 2942883 (daily ed. July 28, 2010) (statement of Rep. Ellison). It *still* "doesn't make sense." *Id.*

In this respect, the 18:1 ratio also fails the goal of the 2010 FSA, which was "to restore fairness to Federal cocaine sentencing."[11] Thus, Representative Paul's description of the 2010 FSA as "the Slightly Fairer Resentencing Act" is also particularly apt in light of the difference between the stated goal and what the Act actually achieves. *Id.* at H6203.

### c.    *Continued pernicious racial impact*

The third problem with the 100:1 ratio recognized by the Commission, and noted in *Kimbrough*, was that, because a large majority of crack defendants are black, the severe sentences required by the 100:1 ratio "are imposed 'primarily on black offenders.'" *Kimbrough*, 552 U.S. at 98 (quoting the 2002 Report at 103). Nothing in the legislative

---

[11]This is how S. 1789 is always identified in the Congressional Record. S.1789 has no provision identifying its "purpose," just as it has no provision identifying any "findings" on which it is based.

record or the Commission's statistical analyses suggests that reducing the ratio to 18:1 will mean that black offenders will become a smaller majority or a minority of offenders convicted of crack offenses. *See* H.R. Rep. No. 670(I), 111th Cong., 2nd Sess. 2010, 2010 WL 4883203, *3 ("Government data demonstrate that drug use rates are similar among all racial and ethnic groups. For crack cocaine, two-thirds of users in the U.S. are white or Hispanic."). Thus, while crack offenders may receive less severe sentences under the 18:1 ratio, they will still receive more severe sentences than powder offenders, and those more severe sentences will continue to be imposed primarily on black offenders. It is little comfort to say that the erosion of public confidence in the federal courts arising from such disparate impact on a racial minority will be slowed, but not eliminated. *See* 2004 Report at 131, 135. In this respect, Representative Paul's description of the 2010 FSA as "the Slightly Fairer Resentencing Act" is also particularly apt. 156 Cong. Rec. H6196-01, H6203, 2010 WL 2942883 (daily ed. July 28, 2010).

### d.  *Use of the ratio as a "proxy" for perceived harms*

In *Gully*, I noted that the 100:1 ratio in the 1986 Act was based, in part, on an assumption that "the crack-to-powder ratio is an appropriate proxy for the supposed seriousness of crack cocaine crimes relative to powder cocaine crimes generally." 619 F. Supp. 2d at 638. I also noted that "sliding" ratios also relied on the assumption that the crack-to-powder ratio could be used as "a proxy for the seriousness of a particular defendant's offenses, so that the appropriate ratio might vary from case to case depending, for example, on the nature of a particular defendant's drug-trafficking offenses and related conduct." *Id.* I suggested that, even if crack is in some respects more harmful than powder cocaine, "the 100:1 ratio is a remarkably blunt instrument to address those effects, because it simply assumes that the quantity ratio can be a proxy for these other harms, instead of basing the punishment on the additional criminal effects and use of weapons

*when they are present in a particular case.*" *Id.* at 641 (emphasis in the original). I concluded "that the appropriate course is to treat interchangeable forms of cocaine as equivalents, and to enhance punishment when additional criminal effects and use of weapons, for example, are present in a particular case." *Id.*

Nothing about the 18:1 ratio squarely addresses this problem. Indeed, it is clear that the opponents of eliminating the crack/powder disparity in its entirety continued to believe that it was appropriate to use the quantity ratio as a proxy for the perceived greater harms of crack cocaine. *See, e.g.,* H.R. Rep. No. 670(I), 111th Cong., 2nd Sess. 2010, 2010 WL 4883203 (views of dissenters in the House Judiciary Committee); *see supra*, beginning on page 45. The 18:1 ratio is a significant downward "slide" from the 100:1 ratio and is certainly a less blunt instrument than a 100:1 ratio. Nevertheless, the 18:1 ratio remains a blunt instrument to address the perceived greater harms of crack cocaine, instead of basing the punishment on the additional criminal effects, such as use of weapons, when they are present in a particular case—even if there were adequate support for the premise that crack cocaine involves all of the perceived greater harms.

### 4. *Additional concerns with the new sentencing scheme*

The 2010 FSA and, more specifically, the Sentencing Guidelines amendments promulgated at the direction of Congress in the 2010 FSA, actually introduce new concerns, as well as continuing and only partially ameliorating the old ones. At the same time that the 2010 FSA dictated a reduction of the crack-to-powder ratio to 18:1, it also dictated that the Commission adopt enhancements for certain aggravating circumstances in drug-trafficking cases. Specifically, Section 5 of the 2010 FSA dictated enhancements

for acts of violence during the course of a drug-trafficking offense,[12] and Section 6 dictated enhancements based on a defendant's role and certain aggravating factors.[13]

---

[12]Specifically, Section 5 provides as follows:

> Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall review and amend the Federal sentencing guidelines to ensure that the guidelines provide an additional penalty increase of at least 2 offense levels if the defendant used violence, made a credible threat to use violence, or directed the use of violence during a drug trafficking offense.

Pub. L. No. 111-220, § 5, 124 Stat. 2372, 2373.

[13]Specifically, Section 6 provides as follows:

> Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall review and amend the Federal sentencing guidelines to ensure an additional increase of at least 2 offense levels if—
>
> (1) the defendant bribed, or attempted to bribe, a Federal, State, or local law enforcement official in connection with a drug trafficking offense;
>
> (2) the defendant maintained an establishment for the manufacture or distribution of a controlled substance, as generally described in section 416 of the Controlled Substances Act (21 U.S.C. 856); or
>
> (3)(A) the defendant is an organizer, leader, manager, or supervisor of drug trafficking activity subject to an aggravating role enhancement under the guidelines; and (B) the offense involved 1 or more of the following super-aggravating factors:
>
> > (i) The defendant—
> >
> > > (I) used another person to purchase, sell, transport, or store controlled substances;
> > >
> > > (II) used impulse, fear, friendship, affection, or some combination thereof to

(continued...)

involve such person in the offense; and
(III) such person had a minimum knowledge of the illegal enterprise and was to receive little or no compensation from the illegal transaction.

(ii) The defendant—
(I) knowingly distributed a controlled substance to a person under the age of 18 years, a person over the age of 64 years, or a pregnant individual;
(II) knowingly involved a person under the age of 18 years, a person over the age of 64 years, or a pregnant individual in drug trafficking;
(III) knowingly distributed a controlled substance to an individual who was unusually vulnerable due to physical or mental condition, or who was particularly susceptible to criminal conduct; or
(IV) knowingly involved an individual who was unusually vulnerable due to physical or mental condition, or who was particularly susceptible to criminal conduct, in the offense.

(iii) The defendant was involved in the importation into the United States of a controlled substance.

(iv) The defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense.

(v) The defendant committed the drug trafficking

(continued…)

The Commission responded by enacting new subsection (b)(2) to U.S.S.G. § 2D1.1, in response to Section 5 of the 2010 FSA, "to create a new specific offense characteristic at subsection (b)(2) providing an enhancement of 2 levels if the defendant used violence, made a credible threat to use violence, or directed the use of violence." *See* 2010 SUPPLEMENT, Vol. 4 at 44. It also responded by amending U.S.S.G. § 2D1.1, in response to § 6 of the 2010 FSA, to create new specific offense characteristics at subsections (b)(11) (providing a 2-level enhancement if the defendant bribed, or attempted to bribe, a law enforcement officer to facilitate the commission of the offense), (b)(12) (providing a 2-level enhancement if the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance), and (b)(14) (providing a 2-level enhancement if the defendant receives an adjustment under §3B1.1 (Aggravating Role) and the offense involved one or more of five specified factors).

While these new enhancements for aggravating circumstances may be—and I think often are—appropriate in particular cases, they become problematic in crack cases. As the Federal Defender points out, the new enhancements do not start from a level playing field between crack and powder defendants. Indeed, the "super aggravating factors" in Section 6(3)(B)(i)(I), (II), and (III) of the 2010 FSA, *see supra, note* 13, are present, singularly or in combination, in virtually every case where there is an organizer, leader, manager or supervisor as defined in section (3)(A). However, the base offense level for a crack offender is already enhanced by the 18:1 ratio, apparently based on the assumed presence

---

[13](...continued)
                    offense as part of a pattern of criminal conduct
                    engaged in as a livelihood.
Pub. L. No. 111-220, § 6, 124 Stat 2372, 2373-74.

of some of these same aggravating circumstances, particularly violence and gang activity, in crack cases. Thus, the result is what the Federal Defender described as a "double whammy," resulting from enhancement of a crack sentence once for assumed presence of harms or aggravating circumstances and then again for the actual presence of harms or aggravating circumstances in a particular case. Nothing allows me to assume that these enhancements, further skewing the treatment of crack offenders, will necessarily be mitigated, in whole or in part, either across-the-board or in specific cases, by new mitigating role reductions required by Section 7 of the 2010 FSA,[14] and incorporated into U.S.S.G. § 3B1.2(a) by the 2010 amendments to the Sentencing Guidelines.

---

[14]Specifically, Section 7 provides increased emphasis on a defendant's role and certain mitigating factors, as follows:

> Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall review and amend the Federal sentencing guidelines and policy statements to ensure that—
>
>> (1) if the defendant is subject to a minimal role adjustment under the guidelines, the base offense level for the defendant based solely on drug quantity shall not exceed level 32; and
>>
>> (2) there is an additional reduction of 2 offense levels if the defendant—
>>
>>> (A) otherwise qualifies for a minimal role adjustment under the guidelines and had a minimum knowledge of the illegal enterprise;
>>>
>>> (B) was to receive no monetary compensation from the illegal transaction; and
>>>
>>> (C) was motivated by an intimate or familial relationship or by threats or fear when the defendant was otherwise unlikely to commit such an offense.

Pub. L. No. 111-220, § 7, 124 Stat 2372, 2374.

Thus, the 18:1 ratio in the 2010 amendments to the Sentencing Guidelines ameliorates, but does not end, the injustices of the 100:1 ratio. Unfortunately, the reduction of the ratio, based on assumed harms of crack cocaine, has been paired with certain new case-specific enhancements, for the same kinds of harms, creating a new "double whammy" effect in crack cocaine cases that is not present in powder cases.

## C. Consideration Of The "New" Ratio

As I indicated at the beginning of this opinion, I initially assumed that, in light of the 2010 FSA and the 2010 amendments to the Sentencing Guidelines, I would change my opinion, set out in *Gully*, 619 F. Supp. 2d at 641-42, from a 1:1 ratio to the "new" 18:1 ratio, because I assumed that Congress, the Sentencing Commission, or the prosecution in this case would have had some medical, chemical, physiological, or other scientific or social science evidence to support that new ratio. Unfortunately, I now find that my assumptions or expectations have not been fulfilled. The new 18:1 crack-to-powder ratio is a dramatic improvement on the former 100:1 ratio and lessens the disparate impact on crack defendants versus powder defendants. Nevertheless, I find that it is just as irrational as the 100:1 ratio and suffers from almost all of the same infirmities as the prior irrational ratio, plus some additional concerns.

### 1. My analysis of the 18:1 ratio

#### a. Statutory minimums versus sentencing guidelines

I recognize that "'[n]othing in the reasoning of *Booker* expands the authority of a district court to sentence below a statutory minimum.'" *United States v. Freemont*, 513 F.3d 884, 890 (8th Cir. 2008) (quoting *United States v. Williams*, 474 F.3d 1130, 1132 (8th Cir. 2007)). The same is true of the specific authorization in *Kimbrough*, *Spears*, and *Pepper* for the district court to reject, on categorical, policy grounds, application of a

*guidelines* sentence. *See Kimbrough*, 552 U.S. at 105 (stating, "If the 1986 Act does not require the Commission to adhere to the Act's method for determining LSD weights, it does not require the Commission—or, after *Booker*, sentencing courts—to adhere to the 100-to-1 ratio for crack cocaine quantities other than those that trigger the statutory mandatory minimum sentences."); *Spears*, 555 U.S. at ___, 129 S. Ct. at 844 (noting that, although a district court may reject a guidelines sentence, categorically, on policy grounds, its analysis of the § 3553(a) factors may properly stop, once it determines that a mandatory minimum sentence is required, thus mooting any further arguments for a further reduced sentence); *and compare Pepper*, 131 S. Ct. at 1236 n.1 (noting that the charge against the defendant carried a mandatory minimum sentence of 120 months of imprisonment, but the mandatory minimum did not apply, because the defendant was eligible for "safety-valve" relief pursuant to 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2, so that the mandatory minimum sentence was not implicated by the district court's rejection of a guidelines sentence on policy grounds).  However, as even the prosecution concedes, there is now no question that a district court has the authority to vary from the sentencing guidelines range based upon a policy disagreement.  Thus, to the extent that the 18:1 ratio in the 2010 amendments to the Guidelines affects a defendant's sentence, I may reject that ratio on policy grounds, just as I rejected the 100:1 ratio in *Gully*.  *See* 619 F. Supp. 2d at 641.

> **b.      *Determining factors***

As my analysis of the 18:1 ratio in the 2010 FSA and the 2010 amendments to the Sentencing Guidelines indicates, it is an improvement over the injustices imposed by the 100:1 ratio under the 1986 Act and Guidelines, but it still suffers from most or all of those injustices, plus some additional ones.  I find that the following factors compel me to reject and vary categorically from the 18:1 crack-cocaine guidelines based on a policy disagreement with those guidelines, even in "mine-run" cases:

- Congress's adoption of the 18:1 ratio was the result of political compromise and expediency, not the result of reasoned analysis of new empirical data or social science research;

- The 18:1 ratio does not exemplify the Sentencing Commission's exercise of its characteristic institutional role of employing an empirical approach based on data about past sentencing practices to develop sentencing guidelines, but is the result of congressional mandates that still interfere with and undermine the work of the Sentencing Commission;

- The assumptions about the relative harmfulness of crack cocaine compared to powder cocaine and the relative harms that come with trafficking in those controlled substances are not supported by research and data in the decades since passage of the 1986 Act and no effort has been made to demonstrate that the 18:1 ratio is more proportional to any additional harms of crack cocaine trafficking, if any, that are borne out by recent research;

- The 18:1 ratio is still inconsistent with the goals of the 1986 Act and is also inconsistent with the 2010 FSA's goal of restoring "fairness" to federal cocaine sentencing, because it tends to have the anomalous effect of punishing low-level crack traffickers more severely than major traffickers in powder cocaine;

- As a corollary to the prior point, the 18:1 ratio fails to recognize the ready convertibility of crack and powder cocaine or that such convertibility is part of the usual course of cocaine trafficking, from producers to retail purchasers;

- The 18:1 ratio still will have a disproportionate impact on black offenders, which will continue to foster disrespect for and lack of confidence in the criminal justice system;

- The 18:1 ratio, as a "proxy" for the assumed risks and harms of crack cocaine, remains a remarkably blunt instrument to address those assumed risks and harms;

- Addition of enhancements for certain aggravating circumstances, including enhancements for violence, in specific cases, will operate as a "double whammy" on crack cocaine defendants, whom the 18:1 ratio already punishes for the assumed presence of such circumstances.

*Cf. Gully*, 619 F. Supp. 2d at 641 (citing similar reasons for rejecting the 100:1 ratio).

### c. The *"unwarranted sentencing disparities" argument*

The prosecution's response to these factors, weighing decisively against adoption of the 18:1 ratio, is not to confront them, but to mount a collateral attack, based on the now rather tired argument that some judges' rejection of the 18:1 ratio on categorical, policy grounds, instead of adhering to the 18:1 ratio passed by Congress and adopted by the Sentencing Commission, may cause "unwarranted" sentencing disparities among defendants with similar records who have been found guilty of similar conduct, contrary to the goals of 18 U.S.C. § 3553(a)(6). This argument still does not convince me to adhere blindly to the 18:1 ratio, when I believe that consideration of all of the pertinent sentencing factors and policies requires a different result.

First, in *Kimbrough*, the Supreme Court expressly rejected the argument that district courts should not be free to deviate from the Guidelines, based on policy disagreements, because allowing them to do so would result in unwarranted disparities. *See Kimbrough*,

522 U.S. at 107. In *Kimbrough*, the "unwarranted disparities" argument took two forms: (1) disparities between defendants subject to mandatory minimums based on the quantity of crack cocaine involved in the offense and defendants convicted of an offense involving a quantity just under what would qualify for a mandatory minimum; and (2) disparities between sentences based on rejection of the 100:1 ratio and sentences based on adherence to that ratio. *See id.* The Court explained its rejection of both of these arguments, as follows:

> Neither of these arguments persuades us to hold the crack/powder ratio untouchable by sentencing courts. *As to the first, the LSD Guidelines we approved in [Neal v. United States, 516 U.S. 284, 116 S. Ct. 763, 133 L. Ed. 2d 709 (1996),] create a similar risk of sentencing "cliffs."* An offender who possesses LSD on a carrier medium weighing ten grams is subject to the ten-year mandatory minimum, *see* 21 U.S.C. § 841(b)(1)(A)(v), but an offender whose carrier medium weighs slightly less may receive a considerably lower sentence based on the Guidelines' presumptive-weight methodology. *Concerning the second disparity, it is unquestioned that uniformity remains an important goal of sentencing. As we explained in Booker, however, advisory Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help to "avoid excessive sentencing disparities."* 543 U.S., at 264, 125 S. Ct. 738. These measures will not eliminate variations between district courts, but our opinion in *Booker* recognized that some departures from uniformity were a necessary cost of the remedy we adopted. *See id.*, at 263, 125 S. Ct. 738 ("We cannot and do not claim that use of a 'reasonableness' standard will provide the uniformity that Congress originally sought to secure [through mandatory Guidelines]."). And as to crack cocaine sentences in particular, we note a congressional control on disparities: possible variations among district courts are

constrained by the mandatory minimums Congress prescribed in the 1986 Act.

> *Moreover, to the extent that the Government correctly identifies risks of "unwarranted sentence disparities" within the meaning of 18 U.S.C. § 3553(a)(6), the proper solution is not to treat the crack/powder ratio as mandatory. Section 3553(a)(6) directs district courts to consider the need to avoid unwarranted disparities—along with other § 3553(a) factors— when imposing sentences. See Gall, ante, 552 U.S., at ----, n. 6, ----, 128 S. Ct. 586, at 596-597, n.6, 599, 2007 WL 4292116. Under this instruction, district courts must take account of sentencing practices in other courts and the "cliffs" resulting from the statutory mandatory minimum sentences. To reach an appropriate sentence, these disparities must be weighed against the other § 3553(a) factors and any unwarranted disparity created by the crack/powder ratio itself.*

*Kimbrough*, 552 U.S. at 107-108 (emphasis added; footnote omitted).

Similarly, Judge Nancy Gertner of the District of Massachusetts has rejected the notion that "unwarranted disparity" should be measured in terms of adherence to the Guidelines:

> The extent of judicial "compliance" with the Guidelines is not a good measure of *unwarranted* disparity post-*Booker* as Professor Scott suggests [in *Inter–Judge Sentencing Disparity After Booker: A First Look* (Ind. Legal Studies Research, Paper No. 140, 2010)]. Judges are supposed to sentence outside the guideline range when the range is greater than necessary or insufficient to meet the purposes of sentencing. This is especially so in career offender/crack cocaine cases, like the instant one. Variances from the Guidelines are frequent in this group precisely because the career offender and crack cocaine guidelines are far too severe, clearly overbroad, and, in the case of the crack guideline, have a profoundly disparate impact on African American offenders.

> *In effect, an outside the guideline sentence may not be optional; it may well be essential to prevent both unwarranted disparity and unwarranted uniformity.* Under the Guidelines, for example, the supplier of cocaine who does his dirty work through street dealers will have little or no criminal record; he may be treated less severely than individuals to whom he sells for street distribution who necessarily have frequent encounters with the police. Likewise, the courier who carries the drugs from the money source to the drug source, may be treated virtually the same (with minor role adjustments) as the people from whom he is taking direction and who stand to gain millions. As Judge Gleeson noted (in a different context) in *United States v. Ovid,* 2010 WL 3940724, *7 (E.D.N.Y.), "the fact that two fraud defendants have similar or even identical *Guidelines ranges* does not necessarily mean they committed similar offenses."

*United States v. Whigham*, ___ F. Supp. 2d ___, 2010 WL 4959882, *12 (D. Mass. Dec. 3, 2010) (emphasis added).[15] Like Judge Gertner, I believe that

---

[15] Judge Gertner expanded upon this theme earlier in her decision in *Whigham*:

> Following the Guidelines, [Professor Scott's article] suggests, promotes the kind of sentencing consistency that the Sentencing Reform Act aimed for.
>
> I disagree with the premise. . . . Similarly situated with respect to the Guideline categories does not necessarily mean similarly situated with respect to the defendant's actual role in the criminal endeavor or his real culpability. Guideline categories (like career offender guidelines) are frequently over broad, giving the same "score" to individuals who are not remotely similar and ignoring critical differences between them (their role in the offense, their mens rea) that should bear on punishment. In any event, in this case, the government's position touting the Scott article was ironic. It agreed that the Guideline sentence is far too high for Whigham.

(continued...)

[c]ritically evaluating the crack/cocaine ratio in terms of its fealty to the purposes of the Sentencing Reform Act is not optional. It is not something that a judge has discretion to do or not to do. The Supreme Court in *Kimbrough* and *Spears* held that an advisory Guideline system required it.

*Whigham*, ___ F. Supp. 2d at ___, 2010 WL 4959882 at *7.

Judge Gertner also stated,

When I choose not to follow the Guidelines, it is not because I simply disagree with them and seek to substitute my own philosophy of sentencing. It is because the Guideline at issue is wholly inconsistent to the purposes of sentencing under 18 U.S.C. § 3553(a). And when I assign a non-Guidelines sentence, I am likewise not picking a number out of the air, but keying what I do, to the extent possible, with the sentences and reasoning of other judges, and the evidence that I have

---

[15](…continued)

To the extent that Scott's findings suggest differences in the approach to the Guidelines among the judges in Massachusetts, they should be carefully evaluated, which I do below. The critical question is what these disparities reflect—whether they reflect the untutored preferences of particular judges, as often occurred pre-Guidelines, or real jurisprudential differences involving Guidelines that are problematic. In my judgment, they reflect the latter; the good faith, reasoned evaluations of Guidelines and facts. Even before *Booker*, the Guidelines contemplated that district court judges would depart from the Guidelines on occasion, that the Commission would consider these departures and amend the Guidelines, if appropriate, allowing for a collaborative evolution of Guideline law. After *Booker*, more of the work of that evolution is to be done by the appeals courts than the Commission—determining which approaches are "reasonable" and which are not.

*Whigham*, ___ F. Supp. 2d at ___, 2010 WL 4959882 at *2 (footnote omitted).

> been given.  Finally, I write decisions so that my reasoning is
> clear and may usefully serve as precedent to others.

*Whigham*, ___ F. Supp. 2d at ___, 2010 WL 4959882 at *3.

I whole-heartedly agree:  The inevitable disparity that arises when one judge chooses to follow a particular guideline and another chooses not to, on policy grounds, imposes upon the judge who rejects the guideline a duty to be sure that his or her objection is not simply a personal one, but an objection based on inconsistency of the rejected guideline with the purposes of sentencing, then to explain the basis for his or her objection. When the objection is on a proper basis, adequately explained, in no sense is the resulting disparity "unwarranted."  Moreover, my decisions to depart from the Guidelines because of my policy disagreements with them have not been a one-way escalator to shorter sentences; rather, my disagreements with the Guidelines have also resulted in sentences that have been substantially harsher than the Guidelines provide.  *See United States v. Vanderbrake*, ___ F. Supp. 2d ___, 2010 WL 488690 (N.D. Iowa Feb. 8, 2011) (rejecting, on policy grounds, the relatively lenient treatment of antitrust violators in the Sentencing Guidelines, as compared to defendants sentenced for fraud, and imposing a sentence on an antitrust defendant of 48 months, rather than a sentence in the guidelines range of 21 to 27 months).

Thus, *Kimbrough* teaches that departures from the Sentencing Guidelines, based on categorical, policy grounds, in light of the purposes of sentencing, are not the sort of "unwarranted" disparities that should make a judge decline to depart from the Guidelines on such grounds.  Policy-based departures from uniformity are a necessary cost of an advisory sentencing guidelines scheme, and the resulting disparities can be best addressed by appellate review and, where appropriate, modification of the guidelines.  *Kimbrough*,

552 U.S. at 107-08. What the prosecution is actually arguing for here is unwarranted uniformity, which is just as offensive to the sentencing scheme as unwarranted disparity.

Second, in my view, the disparity that is "unwarranted" is between crack and powder defendants, based on an 18:1 crack-to-powder disparity, not the disparity between crack defendants, some of whom may be sentenced by judges who adhere to the 18:1 ratio and some of whom may be sentenced by judges who do not. As the Supreme Court explained in *Spears*, the correct interpretation of the holding in *Kimbrough* was the one offered by the dissent in the second decision of the Eighth Circuit Court of Appeals in *Spears*:

> "The [sentencing] court may [vary from the guidelines] based solely on its view that the 100-to-1 ratio embodied in the sentencing guidelines *for the treatment of crack cocaine versus powder cocaine* creates 'an unwarranted disparity within the meaning of § 3553(a),' and is 'at odds with § 3553(a).' The only fact necessary to justify such a variance is the sentencing court's disagreement with the guidelines—its policy view that the 100-to-1 ratio creates an unwarranted disparity."

*Spears*, 555 U.S. at ___, 129 S. Ct. at 842 (quoting 533 F.3d 715, 719 (opinion of Colloton, J.) (emphasis added; citations omitted)).

In short, I agree with Judge Gertner and Chief Judge Robert Hinkle of the Northern District of Florida that "'[i]t is better to have five good sentences and five bad ones than to have ten bad but consistent sentences,'" although, certainly, "'it would be better still to have ten good sentences.'" *Whigham*, ___ F. Supp. 2d at ___, 2010 WL 4959882 at *14 (Gertner, J.) (quoting testimony of Chief Judge Robert Hinkle at a February 11, 2009, hearing before the Sentencing Commission (formerly available at http://www.ussc.gov/ AGENDAS/20090210/Hinkle_statement.pdf, now available at http://www.ussc.gov/

Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20090210-11/ Hinkle_statement.pdf)).

## 2. *The appropriate sentencing methodology*

Because I once again reject the crack-to-powder ratio embodied in the Sentencing Guidelines, on categorical, policy grounds, even in a "mine-run" case, I must also again consider what is the appropriate, reasoned methodology for determining a defendant's sentence in a particular crack case. *See Spears*, 555 U.S. at ___, 129 S. Ct. at 844. In *Gully*, I set out what I then believed was the appropriate methodology, upon rejection of the then-100:1 ratio in the Sentencing Guidelines:

> The court finds that the appropriate methodology is to use a 1:1 crack-to-powder ratio not just in an individual case or in a "mine-run" crack case, but in all "crack" cases, then to enhance sentences for individual defendants for trafficking offenses that actually involve weapons or bodily injury, or for other conduct warranting enhancement under 18 U.S.C. § 3553(a), as the Sentencing Commission proposed in 1995. *See Kimbrough,* 552 U.S. at ----, 128 S. Ct. at 569 (citing Amendments to the Sentencing Guidelines For United States Courts, 60 Fed. Reg. 25075-25077 (1995)). Using this methodology, the parties' arguments about whether or not this particular defendant is merely a street-level dealer or a major trafficker should be accounted for in his sentence, but in the consideration of the 18 U.S.C. § 3553(a), including characteristics of the defendant and circumstances of the offenses, rather than in the crack-to-powder ratio. Specifically, where the Commission—and now the Department of Justice—has proposed sentencing enhancements for trafficking offenses involving weapons or bodily injury, the court finds that it can properly consider such offense-related conduct in its consideration of "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Similarly, where a defendant has a history of violence, whether or not such violence is related to prior drug-trafficking, or was involved in higher levels of crime, that information would warrant

enhancement of the defendant's sentence pursuant to that part of § 3553(a)(1) that requires the court to consider "the history and characteristics of the defendant." As Judge Colloton also noted, "[a]llowing sentencing courts to rely on the range indicated by an alternative crack/powder ratio also helps the sentencing process evolve," for example, because the courts and Congress can develop appropriate considerations for enhancement of sentences. *Spears,* 533 F.3d at 722 (Colloton, J., dissenting).

In other words, in this court's view, the appropriate method is to calculate the guideline range under existing law (*i.e.,* using the 100:1 ratio and any appropriate guideline adjustments or departures), but then to calculate an alternative guideline range using a 1:1 ratio, and to use or vary from that alternative guideline range depending upon the court's consideration of the 18 U.S.C. § 3553(a) factors to account, for example, for the defendant's history of violence, the presence of firearms, or the defendant's recidivism. The difference between this court's method and the prosecution's method is that the court will use a readily ascertainably guideline range based on a 1:1 ratio, after rejecting the 100:1 guideline ratio on policy grounds, then vary based on case- or defendant-specific factors pursuant to 18 U.S.C. § 3553(a), instead of varying (probably downward) some unpredictable amount from the 100:1 ratio guideline range based, in part, on rejection of the 100:1 guideline ratio on policy grounds, with the ultimate crack-to-powder ratio obscured by consideration of other factors.

*Gully*, 619 F. Supp. 2d at 644-45 (footnote omitted); *see id*. at 644 n.5 (noting that this methodology was consistent with the methodology reiterated by the Eighth Circuit Court of Appeals in *United States v. Roberson*, 517 F.3d 990, 993 (8th Cir. 2008)).

Nothing convinces me that this methodology is ultimately any less appropriate upon rejection of the 18:1 ratio. I note only that the November 1, 2010, amendments to the Sentencing Guidelines, described *supra*, beginning on page 67, now require case-specific consideration of certain aggravating circumstances in the context of the Sentencing

Guidelines. Thus, what may have changed is that consideration of those aggravating circumstances may have shifted, at least in the first instance, from the context of the § 3553(a) factors to the context of specific guidelines enhancements, but it remains part of a case-specific analysis, based on a 1:1 ratio, rather disappearing entirely in a simplistic use of a quantity ratio as a "proxy" for those concerns.

### III.  CONCLUSION

Make no mistake: I believe that the replacement of the 100:1 crack-to-powder ratio of the 1986 Act and associated Sentencing Guidelines with the 18:1 crack-to-powder ratio of the 2010 FSA and the November 1, 2010, amendments to the Sentencing Guidelines was a huge improvement, in terms of fairness to crack defendants.  While such incremental improvement is often the nature of political progress on difficult social justice issues—and, in this instance, the increment is perhaps unusually large—an incremental improvement is not enough to make me abdicate my duty to "[c]ritically evaluat[e] the crack/cocaine ratio in terms of its fealty to the purposes of the Sentencing Reform Act." *See Whigham*, ___ F. Supp. 2d at ___, 2010 WL 4959882 at *7.

Performing that duty here, I must reject the Sentencing Guidelines using the "new" 18:1 ratio, just as I rejected the Sentencing Guidelines using the "old" 100:1 ratio, based on a policy disagreement with those guidelines, even in "mine-run" cases, such as this one. I must do so, because I find that the "new" 18:1 guidelines still suffer from most or all of the same injustices that plagued the 100:1 guidelines, including the failure of the Sentencing Commission to exercise its characteristic institutional role in developing the guidelines, the lack of support for most of the assumptions that crack cocaine involves greater harms than powder cocaine, the improper use of the quantity ratio as a "proxy" for the perceived greater harms of crack cocaine, and the disparate impact of the ratio on black offenders.  I also find that the "new" guidelines suffer from some additional concerns, in

that they now create a "double whammy" on crack defendants, penalizing them once for the assumed presence of aggravating circumstances in crack cocaine cases and again for the actual presence of such aggravating circumstances in a particular case.

In one respect the "new" 18:1 guideline ratio is more irrational and pernicious than the original 100:1. When the 100:1 ratio was enacted, Congress and the Sentencing Commission did not have access to the overwhelming scientific evidence that they now have. This overwhelming scientific evidence now demonstrates that the difference between crack and powder is like the difference between ice and water—or beer and wine. Can anyone imagine a sentence that is many times harsher for becoming legally intoxicated by drinking wine rather than beer? Of course not.

I also reiterate that the proper methodology, in light of my policy-based rejection of the 18:1 ratio in the Sentencing Guidelines, is to calculate the guideline range under existing law (*i.e.,* using the 18:1 ratio) and any appropriate guideline adjustments or departures, including the "new" adjustments for aggravating and mitigating circumstances, but then to calculate an alternative guideline range using a 1:1 ratio, again including appropriate guideline adjustments or departures, again including the "new" adjustments for aggravating and mitigating circumstances. The court must ultimately use or vary from that alternative guideline range based upon consideration of the 18 U.S.C. § 3553(a) factors in light of case-specific circumstances.

I will sentence defendant Billy Williams, Sr., accordingly.

**IT IS SO ORDERED.**

**DATED** this 7th day of April, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA